PLATT v. PHILADELPHIA & R. R. CO. et al.

(Circuit Court, E. D. Pennsylvania. November 27, 1894.)

No. 1.

RAILROAD RECEIVERSHIPS—DIRECTIONS TO RECEIVERS—MEMBERSHIP IN LABOR ORGANIZATIONS.

The R. R. Co., in 1887, adopted a rule that no one would be employed by it who was a member of a labor organization, unless he would agree to withdraw therefrom; and, from that time, required every applicant for employment to sign an application, representing that he was not a member of any such organization, or that, if he was, he would withdraw therefrom. Some years later, receivers of the railway company were appointed, and continued the same rule and practice. Certain employés of the receivers petitioned the court to restrain the receivers from acting upon a notice, issued by them, stating their intention to discharge any employés who were members of labor organizations, unless they severed their connection therewith before a certain date. It appeared that all the petitioners had either obtained employment by canceling their membership in such organizations, or had had notice of the rule, and been employed, in violation of it, by subordinate agents, without the knowledge or consent of the receivers; and no others, differently situated, asked to be made parties. *Held,* that the petitioners, who had thus violated a known rule, had no standing to seek to restrain its enforcement; and that, in any event, the court would not direct the receivers to abrogate a rule, established by the owners of the property, and believed by them, and by the receivers, to be advantageous in its management, and which involved nothing unlawful.

This was a petition by Levi Hicks and others, employés of the receivers appointed in the main cause, for directions to such receivers.

Francis Rawle and Day & Montague, for petitioners.

Samuel Dickson and Thomas Hart, Jr., for receivers and railroad company.

DALLAS, Circuit Judge. The subject-matter of this litigation was first brought to the attention of the court by the joint petition (filed

October 8, 1894) of Stephen E. Wilkinson and Thomas McDermott and George H. Ruppel, "acting for themselves and all employés of the Philadelphia & Reading Railroad Company, who are members of an unincorporated voluntary association called the 'Brotherhood of Railroad Trainmen.'" The object of the proceeding was to obtain an order restraining the receivers from acting in pursuance of a notice which had been issued by them, and which is referred to in the petition as follows:

"On or about the 15th day of August last, your petitioners were notified that all members of said association must dissolve their connection with the same on or before October 8th instant, or, failing to do so, would be discharged from the service of the receivers."

The receivers filed an answer to this petition, wherein they stated that Stephen E. Wilkinson was unknown to them; that George H. Ruppel had been employed by them only about one week before the petition was filed, and that he had, as part of his application for employment, declared in writing that he was not, and if employed by the receivers would not become, a member of any labor organization; and that the similar written declaration of Thomas McDermott was supposed to have been destroyed by fire, and unless it should be found there was no present intention of dismissing him. Upon the presentation of the case thus made, it was admitted that Stephen E. Wilkinson was not in the service of the receivers, and, indeed, from the petition itself, it appears that his supposed right of interference was based solely upon the ground that he is "the chief executive officer of the association known as the 'Brotherhood of Railway Trainmen.'" I, however, then thought, as I still think, that neither that association, nor he as its chief officer, had any legal standing to be heard in complaint of any action taken or proposed by the receivers, or to invoke or advise the court's disallowance of any measure adopted or contemplated by them in the performance of the duties assigned to them. They have made no contract with or through this association, and none had been so made by the company. All contracts of hiring or employment have been made directly with the men employed, and Mr. Wilkinson, personally or officially, is a stranger to them. He, or the association which it may be assumed he represents, has, in law, no more connection with them, or with the relation which they create, than has any other person or organization whatsoever. His participation in the proceeding was therefore voluntary and without interest, and his inclusion as a party to the petition was not a mere misjoinder,—it was without color of right. As to the remaining petitioners, the case, in view of the matters set up by the answer, was not pressed, and it is clear that it could not, as to either of them, have been persisted in with success. It could not have been reasonably insisted that the receivers should be compelled to continue Mr. Ruppel in their employment notwithstanding the fact that he had obtained admission to it by making a declaration which was either not true when made, or was immediately afterwards falsified, and the disclaimer of intention to discharge Thomas McDermott of course ended the matter as to him.

The original proceeding having been thus terminated, it was, in

strictness, incapable of revival by the introduction of new parties plaintiff, and the averment, as to them, of a different state of facts. But as no matter of substance demands the enforcement of this principle of equity pleading, and as the objection was not insisted upon when it would have been pertinent, it may well be waived now. The fact is that leave was asked, and was granted, to file an intervening petition; and accordingly (October 8, 1894) the petition of Levi Hicks was filed, wherein it is alleged that he is an employé of the receivers, and is a member of the Brotherhood of Railway Trainmen, and, upon information and belief, that the statements contained in the preceding petition are true. This petition was amended on October 27, 1894, and again on November 13, 1894. The answer to it, as at first presented, was filed on October 12, 1894; and the first amendment was answered on November 5, 1894, and the second amendment on November 19, 1894. The petition of George S. Riley was filed on October 27, 1894, and the answer of the receivers thereto was filed on November 5, 1894. Upon the application of the counsel for the petitioners, the case was assigned for hearing, and, on the day appointed, was fully argued. The case having been thus heard on the petitions, as amended, and the several answers thereto, the answers are to be taken as true (2 Daniell, Ch. Prac. p. 982); and applying this rule to the cases of Levi Hicks and George S. Riley, the facts before the court, so far as deemed to be material, may be concisely stated. Both of these persons are in the service of the receivers, and both are members of the unincorporated association known as the "Brotherhood of Railway Trainmen." A rule was adopted by the railroad company in the year 1887, and has since been maintained by it and by the receivers, to the effect that no one would be employed in its service who was a member of such an association, unless he would agree to withdraw therefrom. Levi Hicks was employed as brakeman on October 20, 1893. The established form of application representing that the applicant was not a member of any labor organization, or that, if such a member, he would withdraw therefrom, was presented to him for signature, and thus the rule above mentioned was especially brought to his notice; but he then declined to state whether or not he was a member of such an organization, and thereupon he was employed, but by a subordinate agent of the receivers, and without their knowledge or that of their general superintendent. On or about August 15, 1894, he was notified by the latter that, unless he would give up his membership in the Brotherhood, he would be discharged. He still, however, retained both his membership and his employment, and on October 8th, the day on which his original petition was filed, and after it had been presented, the general superintendent had an interview with him and others of the employed, at which "no threat was made of discharge, but reference was made to the agreements under which the men had entered the service of the company, and to the rules of the company, and they did agree to withdraw." The proposed discharge of George S. Riley has no connection with his membership in the Brotherhood of Railway Trainmen, but is caused solely by his failure to satisfactorily perform his duties.

The circumstances disclosed in the case of Levi Hicks do not entitle him to the interposition of a court of equity on his behalf. Without animadverting upon his participation in the equivocal and exceptional means by which he secured his present employment, it may, at least, be said that his assumption that the fact that he so secured employment imposes upon the receivers an obligation to retain him in it, ought not to be sustained. Even if they should not be permitted to dismiss an employé because of a fact known to them when they employed him, still they should not be compelled to keep in their service one who, without their knowledge, entered it in conscious violation of a long-established regulation, though with the connivance or negligent assent of some minor official. The notice of August 15, 1894, was therefore rightfully given, and should have been regarded. The receivers had done nothing which, upon any reasonable ground, could be set up to deprive them of that freedom of action which, in such matters, employers and employed are alike and always at liberty to exercise. When unaffected by contractual obligation, the right to determine their personal relations pertains to all men, and is no less inviolable than is their right to form them according to their own will and pleasure. Mr. Hicks might certainly leave the service of his employers for any cause or without cause, and I know of no principle upon which the like privilege could be denied to them. As was said by Mr. Justice Harlan in Arthur v. Oakes, 11 C. C. A. 209, 63 Fed. 317:

"It would be an invasion of one's natural liberty to compel him to work for or to remain in the personal service of another. * * * The rule, we think, is without exception that equity will not compel the actual, affirmative, performance by an employé of merely personal services any more than it will compel an employer to retain in his personal service one who, no matter for what cause, is not acceptable to him for service of that character. The right of an employé, engaged to perform personal service, to quit that service, rests upon the same basis as the right of his employer to discharge him from further personal service. If the quitting in the one case or the discharging in the other is in violation of the contract between the parties, the one injured by the breach has his action for damages, and a court of equity will not indirectly or negatively, by means of an injunction restraining the violation of the contract, compel the affirmative performance from day to day, or the affirmative acceptance, of merely personal services."

The promise made by Mr. Hicks after his petition had been filed may have been, and probably was, influenced by a desire to assure his retention of his place notwithstanding his failure to respect the notice of August 15th, but it was not induced by any threat then made, nor does it appear that his participation in this proceeding was objected against him. If it had been, I would not have hesitated, upon attention being called to it, to make it quite plain that no man can be prejudiced by applying to the court for relief to which he thinks he is entitled. But there is nothing of the kind in this case. The purpose to discharge Mr. Hicks, unless he would resign from the association, was communicated to him about two months prior to October 8th, and his promise of that day was given simply in the exercise of his right of election between the alternatives which had been previously presented to his choice. The fact is that he did agree to sever his connection with the Brotherhood, and,

though in making his selection he was doubtless confronted by a dilemma, it is obvious that he was not in any legal sense subjected to compulsion. But it is not necessary that I should, and I do not, rest my judgment upon this tardy agreement. It is at least .certain that by making it Mr. Hicks acquired no better position than he occupied before, and, without it, I am of opinion that the receivers would have been justified in dismissing him upon ground peculiar to him, and wholly irrespective of the broad question which he has attempted to inject into his case. It results that the petitioner Hicks has not made out a case entitling him to the relief which he seeks, and it is even more manifest that the case of George S. Riley is utterly devoid of equity.

Here discussion might well end, and both petitions be dismissed. This matter has been pending since the 8th day of October, but no person other than those who have been mentioned has asked to intervene. These petitioners assert that they represent other unnamed employés of the receivers, but it has not been shown that they do, and, if it had been, it could not be assumed that such others are better situated than the petitioners themselves. But, even if to be regarded as class bills, these petitions could inure to the benefit of persons only whose claim to relief is the same as that of the specified complainants, and whose equal title is founded upon the same alleged equity. The case of the actual plaintiffs cannot be strengthened by an averment that the case of some other person or persons, if presented, would be stronger. But it is contended that the general proposition which has been discussed at bar should be abstractly considered, and without regard to the merits of the particular cases in which it has been propounded,—that the court, being informed that receivers of its appointment are alleged to be pursuing a wrongful course, should investigate their conduct at the instance of any informer, though himself without standing to complain of it, and, if it should find that wrong has been done or is purposed, should prohibit its continuance or commission. I cannot assent to this. It is hardly necessary to say that, in an ordinary case, an injunction will not be awarded except at the suit of a party threatened with injury, and I am unable to perceive why, in the case of a receivership, a court of equity should be moved to restrain its receivers, or to admonish them as to their duty, at the instance of an accuser who is not interested either in the cause or in the particular subject to which his accusation relates. Any such practice would be anomalous. It would not be supported by either reason or authority. Its effect would be mischievous. If receivers were required to answer with respect to their official acts at the suit of a mere meddler, the administration of their trust might be impeded by the constant and repeated intrusion of causeless objections; and, if the courts were to examine every criticism which might be volunteered for their attention, they would simply invite any litigious busybody to add his chimeras to the burden which cases of this kind legitimately impose upon the judges. Yet, as the counsel of the petitioners have earnestly urged me to inquire, as of my own motion and independently of suggestion, whether these receivers should not be directed

to abandon the position with respect to labor organizations in which a rule of the railroad company has placed them, I have carefully and fully considered the matter, and, waiving the irregularity in this case, I will, so far as I deem it to be proper that I should do so, briefly indicate my views upon the question thus pressed for decision.

The rule which is attacked was established, not by the receivers, but by the railroad company itself, and several years before these receivers or their predecessors in office were appointed. Therefore the question is not whether a policy originated by the receivers should be sanctioned, but whether they should be forbidden to continue in force a regulation which they found in operation when they assumed control of the business. It is to be observed, too, that it is not essential to the proper determination of this question that the character or objects of the association called the "Brotherhood of Railway Trainmen" should be either approved or condemned. In the argument submitted for the petitioners much has been said in condemnation of it, and in support of the claim that it is not only a lawful body created for beneficent purposes, but is one of a class which public policy encourages and upholds. I think, however, that the court should not needlessly enter upon the investigation of this claim. The Brotherhood of Trainmen is not a party to this proceeding, and therefore its constitution, conduct, and motives should not be unnecessarily scrutinized. If I entertained an unfavorable opinion of it, it would be manifestly improper for me to seek occasion to express that opinion; and it would, I think, be scarcely less objectionable for me to obtrude any declaration in its favor. The ground upon which it is supposed that the courts should avail themselves of every pretext to discuss and rule upon the good or evil influence and tendencies of such associations is, in my judgment, the very ground upon which they should endeavor to firmly maintain a judicious reserve with respect to them. If, indeed, an inquiry as to their status and aims would involve the consideration of "vexed and new questions," of "the greatest social problem of the day," and of "the burning question of modern times," then surely the announcement of a "policy of courts" concerning them should not be attempted, but avoided. The solution of social problems, and of vexed, new, and burning questions, has not been confided to the judiciary. Courts are established to administer the will of the legislature as embodied in law, and not the personal, it may be discordant, views of the judges themselves on matters of public concern. Evils resulting from the inconsiderate conduct of either employers or the employed "are to be met and remedied by legislation"; and, "in the absence of legislation to the contrary, the right of one in the service of a quasi public corporation to withdraw therefrom at such time as he sees fit, and the right of the managers of such a corporation to discharge an employé from service whenever they see fit, must be deemed so far absolute that no court of equity will compel him, against his will, to remain in such service, or actually to perform the personal acts required in such employments, or compel such managers, against their will, to keep a particular employé in their serv-

ice." Arthur v. Oakes, 11 C. C. A. 209, 63 Fed. 319. The real question, is not whether the Brotherhood of Railway Trainmen is or is not inimical to the general welfare, but whether these receivers should be ordered to retain its members in their service, despite the company's pre-existing rule to the contrary, and against their own unanimous judgment. If such an order ought to be made, it must be because the action to be restrained would injuriously affect the interests the receivers have in charge, or would be contrary to law, or unjust to those immediately concerned. If there is any other consideration upon which the direction asked for could be based, counsel have not suggested it nor do I perceive it.

There is absolutely nothing before the court which would warrant it in holding that the trust property is likely to be injuriously affected by the receivers' enforcement of the company's rule. No one interested in that property has said so, and the receivers, who, presumably, are best qualified to form an opinion on the subject, and who cannot be assumed to be untruthful, have united in the statement that they believe it to be to the interest of their trust that the rule referred to should be enforced. I accept this—the only evidence on the subject —as conclusive. I am not competent to form an independent judgment upon it; and in this district the practice of the court has always been to rely largely upon the discretion of its receivers with respect to the policy and details of their management, especially where, as in the present instance, it is not challenged by any person who is entitled to question it.

That the contemplated action is not unlawful is too plain for argument. That it contravenes public policy is asserted, but how can this be established? I know of no means of ascertaining the policy of the public in relation to personal rights, but by consulting the public laws. This particular association is not a corporation, but if it was it would not follow, as seems to be supposed, that it could rightfully insist upon the retention of its members in the service of another corporation, against its will. Neither is the argument advanced by showing that in some states it has been declared by statute to be a penal offense for any employer of labor to coerce or compel any person to enter into an agreement not to join any labor organization, as a condition of such person's continuance in such employer's service. I need not consider the effect of these enactments within the territorial limits of the sovereignties by which they have been enacted. It is enough to say that they are not to be found upon the statute book of the state of Pennsylvania, or of the United States, and therefore they are neither applicable to this case nor mandatory upon this court; and if any inference as to the "policy," either of the federal government or of Pennsylvania, can rationally be deduced from the existence of such laws in certain of the states, it would seem to be that, by abstaining from similar legislation, congress and the General Assembly of Pennsylvania have indicated their dissent from its principle. At all events, public policy cannot, in the absence of law, be enforced by courts of justice. Policy may direct the legislature in commanding what is right, and prohibiting what is

wrong, but the law alone determines for the courts the rightful or wrongful nature of any conduct which is submitted to judicial investigation.

I do not doubt the authority of a court of equity to restrain its receivers from treating those whom they employ unjustly or oppressively; and when its power in that behalf is properly invoked, and the allegation of injustice or oppression is sustained, the protection which such a court may afford should be promptly and efficiently accorded. This, in my opinion, is and should be the law; but has a case of injustice or oppression been made out in the present instance? The rule complained of was promulgated as long ago as the year 1887, and the receivers emphatically assert their belief, which is not controverted, that no employé has since entered the service in ignorance of its existence, or joined the Brotherhood of Railway Trainmen without being aware that by so doing he violated it. There is some uncertainty as to the number of the receivers' employés who have become members of the Brotherhood, but it is certain that they constitute a very small proportion of the whole force. To release these particular men from the operation of a rule which was known to them when they took employment, and which, except possibly in a few instances occurring through the oversight or neglect of some subordinate agent, they expressly accepted, would be unfair to the others; and to wholly abrogate the rule or to suspend its operation generally would open the door to a complete reversal of a policy which was deliberately established by the company several years ago, and which has since been pursued. In short, the court is asked, in a proceeding ostensibly instituted to obtain an order for the guidance of the receivers during the brief period of their control, to enter a decree the practical effect of which would be to permanently annul a regulation adopted by the owners of the property, and this without the consent of those now interested in it. I have not been convinced that there is anything in this case which would justify compliance with this request. It is possible there may be a few men—there cannot be many—to whom the strict enforcement of the rule would occasion some hardship, but no such case has been made known, and the answers of the receivers display no vindictive feeling or disposition to harshness. I have no hesitation in relying upon them to deal fairly and discriminatingly with any case which may reasonably call for peculiar consideration. The several petitions mentioned in this opinion are dismissed.