HOPKINS et al. v. OXLEY STAVE CO.

(Circuit Court of Appeals, Eighth Circuit. November 8, 1897.)

No. 789.

1. FEDERAL COURTS—JURISDICTION—CITIZENSHIP.
   A federal court is not deprived of jurisdiction of a suit for an injunction against numerous individual defendants by the fact that some of those joined as defendants were citizens of the same state as the complainant, when, as to them, the bill was dismissed shortly after it was filed, and before an injunction was awarded.

2. INJUNCTION—CONSPIRACY TO COMMIT TORT—PARTIES.
   The rule is as well settled in equity as it is at law that where a right of action arises ex delicto the tort may be treated as joint or several, at the election of the injured party. Where a conspiracy by the members of certain labor organizations had been formed to injure the business of a corporation, it was accordingly held that the corporation might treat the tort as joint or several, and maintain a suit against all or against any number of the conspirators, to enjoin them from carrying the same into effect.

3. SAME—UNLAWFUL CONSPIRACY—BOYCOTT.
   The members of two labor organizations entered into a combination to compel a manufacturer of casks and barrels to discontinue the use of a machine for hooping the same. This object was to be accomplished by notifying the plaintiff's customers and other persons not to purchase machine-hooped barrels, and by inducing the members of all labor organizations throughout the country, and persons who were in sympathy with them, not to purchase provisions or other commodities which were

packed in machine-hooped barrels. *Held*: First, that the combination in question was an unlawful conspiracy to deprive the plaintiff of its right to manage its business as it thought best, such as would entitle the manufacturer to recover from the parties concerned in the conspiracy whatever damages it had sustained thereby; second, that in such a case the test of the right to sue in equity was whether the damages occasioned by the conspiracy would be irreparable, or whether a proceeding in equity was necessary to prevent a multitude of suits,—in other words, whether the remedy at law was for any reason inadequate; third, that in the case in hand the plaintiff was entitled to sue in equity, and that an injunction to prevent the execution of the conspiracy was properly awarded. Steamship Co. v. McGregor, 23 Q. B. Div. 598, 616, Continental Ins. Co. v. Board of Fire Underwriters, 67 Fed. 310, and Manufacturing Co. v. Hollis, 55 N. W. 1119, 54 Minn. 223, distinguished.

Caldwell, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the District of Kansas.

This was a bill for an injunction by the Oxley Stave Company against the Coopers' International Union of North America, Lodge No. 18; the Trades Assembly of Kansas City, Kan.; and a number of the individual members of such organizations. As against the organizations, the bill was dismissed, and a temporary injunction was granted against the remaining defendants, from which they appeal.

James F. Getty (F. D. Hutchings, on the brief), for appellants.

David Overmyer (David W. Mulvane, on the brief), for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge. This case comes on appeal from an order made by the circuit court of the United States for the district of Kansas, granting an interlocutory injunction. The motion for the injunction was heard on the bill and supporting affidavits, and on certain opposing affidavits. There is no substantial controversy with reference to the material facts disclosed by the bill and accompanying affidavits, which may be summarized as follows: The appellants, H. C. Hopkins and others, who were the defendants below, are members of two voluntary, unincorporated associations, termed, respectively, the Coopers' International Union of North America, Lodge No. 18, of Kansas City, Kan., and the Trades Assembly of Kansas City, Kan. The first of these associations is a labor organization composed of coopers, which has local lodges in all the important trade centers throughout the United States and Canada. The other association, the Trades Assembly of Kansas City, Kan., is a body composed of representatives of many different labor organizations of Kansas City, Kan., and is a branch of a general organization of the same name which exists and operates, by means of local assemblies, in all the principal commercial centers of the United States and Europe. The Oxley Stave Company, the plaintiff below and appellee here, is a Missouri corporation, which is engaged at Kansas City, Kan., where it has a large cooperage plant, in the manufacture of barrels and casks for packing meats, flour, and other commodities. It sells many barrels and casks annually to several large packing associations located at Kansas City, Mo., and Kansas City, Kan., and also has customers for its product in 16 other states

83 F.—58

of the Union, and in Europe.   Its annual output for the year 1895 was of the value of $164,173.   For some time prior to November 16, 1895, the plaintiff company had used successfully in its cooperage plant at Kansas City, Kan., certain machines for hooping barrels, which materially lessened the cost of making the same.   It did not confine itself exclusively to the manufacture of machine-hooped barrels, but manufactured, besides, many hand-hooped barrels, and employed a large number of coopers for that purpose.   The wages paid to the coopers in its employ were satisfactory, and no controversy had arisen between the plaintiff and its employés on that score. On or about November 16, 1895, the plaintiff company was informed by a committee of persons representing the local lodge of the Coopers' Union, No. 18, at Kansas City, Kan., that it must discontinue the use of hooping machines in its plant.   Said committee further informed the plaintiff that they had already notified one of its largest customers, Swift & Co., that, in making contracts with the plaintiff for barrels, the Coopers' Union would require such customer, in future, to specify that all barrels supplied to it by the plaintiff must be hand-hooped.   None of the members of this committee were employés of the plaintiff company, and, with one exception, none of the present appellants were or are in its employ.   At a later date the Coopers' Union, No. 18, called to its assistance the Trades Assembly of Kansas City, Kan., for the purpose of enforcing its aforesaid demand; and on or about January 14, 1896, a committee of persons representing both of said organizations waited upon the manager of the plaintiff company, and notified him, in substance, that said organizations had each determined to boycott the product of the plaintiff company unless it discontinued the use of hooping machines in its plant, and that the boycott would be made effective on January 15, 1896.   The formal action taken by the Trades Assembly was evidenced by the following resolution:

"To the Officers and Members of the Trades Assembly—Greeting: Whereas, the cooperage firms of J. R. Kelley and the Oxley Cooperage Company have placed in their plants hooping machines operated by child labor; and whereas, said hooping machines is the direct cause of at least one hundred coopers being out of employment, of which a great many are unable to do anything else, on account of age, and at a meeting held by Coopers' Union No. 18 on the 31st of December, 1895, a committee was appointed to notify the above firms that unless they discontinued the use of said machines on and after the 15th of January, 1896, that Coopers' Union No. 18 would cause a boycott to be placed on all packages hooped by said machines the 15th of January, 1896, and at a meeting held by Coopers' Union No. 18 on the 4th of January, 1896, delegates were authorized to bring the matter before the Trades Assembly in proper form, and petition the assembly to indorse our action, and to place the matter in the hands of their grievance committee, to act in conjunction with the committee appointed by Coopers' Union No. 18 to notify the packers before letting their contracts for their cooperage: Therefore, be it resolved, that this Trades Assembly indorse the action of Coopers' Union No. 18, and the matter be left in the hands of the grievance committee for immediate action.

"Yours, respectfully,                                         J. L. Collins,
"Sec'y Coopers' International Union of North America, Lodge 18."

It was also charged, and the charge was not denied, that the members of the voluntary organizations to which the defendants belonged

had conspired and agreed to force the plaintiff, against its will, to abandon the use of hooping machines in its plant, and that this object was to be accomplished by dissuading the plaintiff's customers from buying machine-hooped barrels and casks; such customers to be so dissuaded through fear, inspired by concerted action of the two organizations, that the members of all the labor organizations throughout the country would be induced not to purchase any commodity which might be packed in such machine-hooped barrels or casks. The bill charged, by proper averments (and no attempt was made to prove the contrary), that the defendants were persons of small means, and that the plaintiff would suffer a great and irreparable loss, exceeding $100,000, if the defendants were allowed to carry the threatened boycott into effect in the manner and form proposed. The injunction which the court awarded against the defendants was, in substance, one which prohibited them, until the final hearing of the case, from making effective the threatened boycott, and from in any way menacing, hindering, or obstructing the plaintiff company, by interfering with its business or customers, from the full enjoyment of such patronage and business as it might enjoy or possess independent of such interference.

The first proposition contended for by the appellants is that the trial court acted without jurisdiction in awarding an injunction. The ground for this contention consists in the fact that in the bill, as originally filed, two persons were named as defendants who were citizens and residents of the state of Missouri, under whose laws the Oxley Stave Company was incorporated. But as the case was dismissed as to these defendants, and as to the two voluntary unincorporated associations, and as to all the members thereof who were not specifically named as defendants in the bill of complaint, before an injunction was awarded, and as the bill was retained only as against persons concerned in the alleged conspiracy who were citizens and residents of the state of Kansas, the objection to the jurisdiction of the trial court is, in our opinion, without merit. Oxley Stave Co. v. Coopers' International Union of North America, 72 Fed. 695. It is further urged that the trial court had no right to proceed with the hearing of the case in the absence of any of the persons who were members of the two voluntary organizations, to wit, the Coopers' Union, No. 18, and the Trades Assembly of Kansas City, Kan., because all the members of those organizations were parties to the alleged conspiracy. This contention seems to be based on the assumption that every member of the two organizations had the right to call upon every other member for aid and assistance in carrying out the alleged conspiracy, and that an injunction restraining a part of the members from rendering such aid and assistance would necessarily operate to the prejudice of those members who had not been made parties to the suit. In other words, the argument is that certain indispensable parties to the suit have not been made parties, and that full relief, consistent with equity, cannot be administered without their presence upon the record. We do not dispute the existence of the rule which the defendants invoke, but it is apparent, we think, that it has no application to the case in hand. The present

suit proceeds upon the theory—without which no relief can be afforded—that the agreement entered into between the members of the two voluntary associations aforesaid is an unlawful conspiracy to oppress and injure the plaintiff company; that no right whatsoever can be predicated upon, or have its origin in, such an agreement; and that the members of the two organizations are jointly and severally liable for whatever injury would be done to the plaintiff company by carrying out the object of the alleged agreement. The rule is as well settled in equity as it is at law that, where the right of action arises ex delicto, the tort may be treated as joint or several, at the election of the injured party, and that he may, at his option, sue either one or more of the joint wrongdoers. Cunningham v. Pell, 5 Paige, 607; Wall v. Thomas, 41 Fed. 620, and cases there cited. We perceive no reason, therefore, why the case was not properly proceeded with against the appellants, although numerous other persons were concerned in the alleged combination or conspiracy.

We turn, therefore, to the merits of the controversy. The substantial question is whether the agreement entered into by the members of the two unincorporated associations to boycott the contents of all barrels, casks, and packages made by the Oxley Stave Company which were hooped by machinery was an agreement against which a court of equity can afford relief, preventive or otherwise. The contention of the appellants is that it was a lawful agreement, such as they had the right to make and carry out, for the purpose of maintaining the rate of wages then paid to journeymen coopers, and that, being lawful, the injury occasioned to the plaintiff company, no matter how great, was an injury against which neither a court of law nor equity can afford any redress. According to our view of the case, the claim made by the defendants below, that one object of the threatened boycott was to prevent the employment of child labor, is in no way material; but, in passing, it will not be out of place to say that this claim seems to have been a mere pretense, since it was shown that the machinery used to hoop barrels cannot be managed by children, but must, of necessity, be operated by persons who have the requisite strength to handle barrels and casks weighing from 75 to 80 pounds with great rapidity. It is manifest that this is a species of labor which could not, in any event, be performed by children. Neither do we deem it necessary on the present occasion to define the term "boycott"; for, whatever may be the meaning of that word, no controversy exists in the present case concerning the means that were to be employed by the members of the two labor organizations for the purpose of compelling the plaintiff company to abandon the use of hooping machines. It is conceded that their purpose was to warn all of the plaintiff's immediate customers not to purchase machine-hooped barrels or casks, and to warn wholesale and retail dealers everywhere not to handle provisions or other commodities which were packed in such barrels or casks. This warning was to be made effectual by notifying the members of all associated labor organizations throughout the United States, Canada, and Europe, not to purchase provisions or other commodities, and, as far as pos-

sible, to dissuade others from purchasing provisions or other commodities which were packed in machine-hooped barrels or casks. The object of the conspiracy, it will be seen, was to interfere with the complainant's business, and to deprive the complainant company, and numerous other persons, of the right to conduct their business as they thought proper. To this end, those who were engaged in the conspiracy intended to excite the fears of all persons who were engaged in making barrels, or who handled commodities packed in barrels, that, if they did not obey the orders of the associated labor organizations, they would incur the active hostility of all the members of those associations, suffer a great financial loss, and possibly run the risk of sustaining some personal injury. It may be conceded that, when the defendants entered into the combination in question, they had no present intention of resorting to actual violence for the purpose of enforcing their demands; but it is manifest that by concerted action, force of numbers, and by exciting the fears of the timid, they did intend to compel many persons to surrender their freedom of action, and submit to the dictation of others in the management of their private business affairs. Another object of the conspiracy, which was no less harmful, was to deprive the public at large of the advantages to be derived from the use of an invention which was not only designed to diminish the cost of making certain necessary articles, but to lessen the labor of human hands.

While the courts have invariably upheld the right of individuals to form labor organizations for the protection of the interests of the laboring classes, and have denied the power to enjoin the members of such associations from withdrawing peaceably from any service, either singly or in a body, even where such withdrawal involves a breach of contract (Arthur v. Oakes, 11 C. C. A. 209, 63 Fed. 310), yet they have very generally condemned those combinations usually termed "boycotts," which are formed for the purpose of interfering, otherwise than by lawful competition, with the business affairs of others, and depriving them, by means of threats and intimidation, of the right to conduct the business in which they happen to be engaged according to the dictates of their own judgments. The right of an individual to carry on his business as he sees fit, and to use such implements or processes of manufacture as he desires to use, provided he follows a lawful avocation, and conducts it in a lawful manner, is entitled to as much consideration as his other personal rights; and the law should afford protection against the efforts of powerful combinations to rob him of that right and coerce his will by intimidating his customers and destroying his patronage. A conspiracy to compel a manufacturer to abandon the use of a valuable invention bears no resemblance to a combination among laborers to withdraw from a given employment as a means of obtaining better pay. Persons engaged in any service have the power, with which a court of equity will not interfere by injunction, to abandon that service, either singly or in a body, if the wages paid or the conditions of employment are not satisfactory; but they have no right to dictate to an employer what kind of implements he shall use, or whom he shall employ. Many courts of the highest character and ability

have held that a combination such as the one in question is admitted to have been is an unlawful conspiracy, at common law, and that an action will lie to recover the damages which one has sustained as the direct result of such a conspiracy; also, that a suit in equity may be maintained to prevent the persons concerned in such a combination from carrying the same into effect, when the damages would be irreparable, or when such a proceeding is necessary to prevent a multiplicity of suits. The test of the right to sue in equity is whether the combination complained of is so far unlawful that an action at law will lie to recover the damages inflicted, and whether the remedy at law is adequate to redress the wrong. If the remedy at law is for any reason inadequate, resort may be had, as in other cases, to a court of equity. In the case of Spinning Co. v. Riley, L. R. 6 Eq. 551, 558, Vice Chancellor Malins held that an injunction was a proper remedy to prevent the officers of a trades union from using placards and advertisements to dissuade laborers from hiring themselves to the spinning company pending a dispute between the latter company and the trades union as to wages. The court said:

"That every man is at liberty to induce others, in the words of the act of parliament, 'by persuasion or otherwise,' to enter into a combination to keep up the price of wages, or the like: but directly he enters into a combination which has as its object intimidation or violence, or interfering with the perfect freedom of action of another man, it then becomes an offense, not only at common law, but also an offense punishable by the express enactment of the act 6 Geo. IV., c. 129. It is clear, therefore, that the printing and publishing of these placards and advertisements by the defendants, admittedly for the purpose of intimidating workmen from entering into the service of the plaintiffs, are unlawful acts, punishable by imprisonment, under Id., c. 129, and a crime at common law."

In Temperton v. Russell [1893] 1 Q. B. 715, the facts appear to have been that a committee representing certain trades unions, for the purpose of enforcing obedience to certain rules that had been adopted by the unions, notified the plaintiff not to supply building materials to a certain firm. He having declined to comply with such request, the committee thereupon induced certain third parties not to enter into further contracts with the plaintiff; such third parties being so induced by threats or representations that the unions would cause their laborers to be withdrawn from their employ in case such further contracts were made. It was held that the plaintiff had a right of action against the members of the committee for maliciously conspiring to injure him by preventing persons from having dealings with him. In delivering the judgment of the court the master of the rolls (Lord Esher) quoted with approval a statement of the law which is found in Bowen v. Hall, 6 Q. B. Div. 333, to the effect that where it appears that a defendant has, by persuasion, induced a third party to break his contract with the plaintiff, either for the purpose of injuring the plaintiff, or for the purpose of reaping a personal advantage at the expense of the plaintiff, the act is wrongful and malicious, and therefore actionable. In the case of State v. Stewart, 59 Vt. 273, 9 Atl. 559, it was held that a combination entered into for the purpose of preventing or deterring a corporation from taking into its service certain persons

whom it desired to employ was an unlawful combination or conspiracy at common law. The court said:

"The principle upon which the cases, English and American, proceed, is that every man has the right to employ his talents, industry, and capital as he pleases, free from the dictation of others; and, if two or more persons combine to coerce his choice in this behalf, it is a criminal conspiracy. The labor and skill of the workmen, be it of high or low degree, the plant of the manufacturer, the equipment of the farmer, the investments of commerce, are all, in equal sense, property. If men, by overt acts of violence, destroy either, they are guilty of crime. The anathemas of a secret organization of men appointed for the purpose of controlling the industry of others by a species of intimidation that work upon the mind, rather than the body, are quite as dangerous, and generally altogether more effective, than acts of actual violence. And, while such conspiracies may give to the individual directly affected by them a private right of action for damages, they at the same time lay the basis for an indictment, on the ground that the state itself is directly concerned in the promotion of all legitimate industries and the development of all its resources, and owes the duty of protection to its citizens engaged in the exercise of their callings."

In Barr v. Trades Council (N. J. Ch.) 30 Atl. 881, it appeared that a publisher of a newspaper had determined to use plate matter in making up his paper, whereupon the members of a local typographical union, conceiving their interests to be prejudiced by such action, entered into a combination to compel him to desist from the use of such plate matter. The object of the combination was to be accomplished by the typographical union by a formal call upon all labor organizations with which it was affiliated, and upon all other persons who were in sympathy with it, to boycott the paper, by refusing to buy it or advertise in the same. It was held, in substance, that a person's business is property, which is entitled under the law to protection from unlawful interference, and that the combination in question was illegal, because it contemplated a wrongful interference with the plaintiff's freedom of action in the management of his own affairs. Decisions embodying substantially the same views have been made by many other courts. Hilton v. Eckersley, 6 El. & Bl. 47, 74; Steamship Co. v. McKenna, 30 Fed. 48; Casey v. Typographical Union, 45 Fed. 135; Thomas v. Railway Co., 62 Fed. 803, 818; Arthur v. Oakes, 11 C. C. A. 209; 63 Fed. 310, 321, 322. See, also, Carew v. Rutherford, 106 Mass. 1; Walker v. Cronin, 107 Mass. 555; State v. Glidden, 55 Conn. 46, 8 Atl. 890; Vegelahn v. Guntner (Mass.) 44 N. E. 1077. The cases which seem to be chiefly relied upon as supporting the contention that the combination complained of in the case at bar was lawful, and that the action proposed to be taken in pursuance thereof ought not to be enjoined, are the following: Mogul S. S. Co. v. McGregor, 23 Q. B. Div. 598; Id. [1892] App. Cas. 25; Continental Ins. Co. v. Board of Fire Underwriters of the Pacific, 67 Fed. 310; and Bohn Mfg. Co. v. Hollis, 54 Minn. 223, 55 N. W. 1119. In the first of these cases the facts were that the owners of certain steamships, for the purpose of securing all the freight which was shipped at certain ports, and doing a profitable business, had formed an association, and issued a circular to shippers at said ports, agreeing to allow them a certain rebate on freight bills, provided they gave their patronage exclusively to ships belonging to members of the associa-

tion. The association also prohibited its soliciting agents from act-
ing as agents for other competing lines. A suit having been brought
against the members of the association, by a competing shipowner, to
recover damages which had been sustained in consequence of the
formation and action of the association, it was held that the acts
complained of were lawful, the same having been done simply for the
purpose of enabling the members of the association to hold and extend
their trade; in other words, that the acts complained of amounted to
no more than lawful competition in trade. Continental Ins. Co. v.
Board of Fire Underwriters of the Pacific, was a case of the same
character as the one last considered, and involved an application of
the same doctrine. It was held, in substance, that an association of
fire underwriters which had been formed under an agreement that
provided, among other things, for the regulation of premium rates,
the prevention of rebates, compensation of agents, and nonintercourse
with companies that were not members of the association, was not
an illegal conspiracy, and that the accomplishment of its purpose by
lawful means would not be enjoined at the suit of a competing insur-
ance company which was not a member of the association. In the
case of Bohn Mfg. Co. v. Hollis, it appeared that a large number
of retail lumber dealers had formed a voluntary association, by which
they mutually agreed that they would not deal with any manufacturer
or wholesale dealer who should sell lumber directly to consumers,
not dealers, at any point where a member of the association was
carrying on a wholesale lumber business, and had provided in their
by-laws that, whenever any wholesale dealer or manufacturer made
any such sale, the secretary of the association should notify all mem-
bers of the fact. The plaintiff having made such a sale, and the
secretary being on the point of sending a notice of the fact to mem-
bers of the association, as provided by the by-laws, it was held that
the sending of such a notice was not actionable, and that an injunc-
tion to restrain the sending of such notice ought not to issue. The
decision to this effect was based on the ground that the members of
the association might lawfully agree with each other to withdraw their
patronage, collectively, for the reasons specified in the agreement,
because the members, individually, had the right to determine from
whom they would make purchases, and to withdraw their patronage
at any time, and for any reason which they deemed adequate. We are
not able to concede, however, that it is always the case that what
one person may do without rendering himself liable to an action many
persons may enter into a combination to do. It has been held in
several well-considered cases that the law will sometimes take cog-
nizance of acts done by a combination which would not give rise to a
cause of action if committed by a single individual, since there is a
power in numbers, when acting in concert, to inflict injury, which
does not reside in persons acting separately. Steamship Co. v. Mc-
Gregor [1892] App. Cas. 24, 25; Id., 23 Q. B. Div. 598, 616; Arthur v.
Oakes, 11 C. C. A. 209, 63 Fed. 310, 321; State v. Glidden, 55 Conn.
46, 8 Atl. 890. But if we concede that the reasoning employed in
Manufacturing Co. v. Hollis was sound, as applied to the facts in that
case, yet it by no means follows (and that fact was recognized in the

decision) that the members of the association would have had the power to combine for the purpose of compelling other persons, not members of the association, to withhold their patronage from a wholesale dealer who failed to conduct his business in the mode prescribed by the association.

We think it is entirely clear, upon the authorities, that the conduct of which the defendants below were accused cannot be justified on the ground that the acts contemplated were legitimate and lawful means to prevent a possible future decline in wages, and to secure employment for a greater number of coopers. No decrease in the rate of wages had been threatened by the Oxley Stave Company, and, with one exception, the members of the combination were not in the employ of the plaintiff company. The members of the combination undertook to prescribe the manner in which the plaintiff company should manufacture barrels and casks, and to enforce obedience to its orders by a species of intimidation which is no less harmful than actual violence, and which usually ends in violence. The combination amounted, therefore, to a conspiracy to wrongfully deprive the plaintiff of its right to manage its business according to the dictates of its own judgment. Aside from the foregoing considerations, the fact cannot be overlooked that another object of the conspiracy was to deprive the public at large of the benefits to be derived from a labor-saving machine which seems to have been one of great utility. If a combination to that end is pronounced lawful, it follows, of course, that combinations may be organized for the purpose of preventing the use of harvesters, threshers, steam looms, and printing presses, typesetting machines, sewing machines, and a thousand other inventions which have added immeasurably to the productive power of human labor, and the comfort and welfare of mankind. It results from these views that the injunction was properly awarded, and the order appealed from is accordingly affirmed.

CALDWELL, Circuit Judge (dissenting). To prevent the merits of the case from being misconceived or obscured, it is well to state at the threshold what it does, and what it does not, involve. It involves no question of the obstruction of interstate commerce, or the United States mails, or any other federal right. The bill does not charge that the defendants violated any law of the state of Kansas or of the United States, or that they threaten to do so, or that they are guilty of any breach of the public peace, or that any violence or injury to person, or to public or to private property, was perpetrated, threatened, contemplated, or feared. To show precisely what the suit does involve, that portion of the bill which states the plaintiff's grounds of complaint is here copied:

"And your orator alleges and charges that the said defendants have combined, confederated, and conspired together to require of your orator to discontinue in its plant and plants the use of said hooping machines, and, upon refusal of your orator so to do, to boycott the product of your orator's said plant and plants; that is to say, to persuade and coerce all other persons to abstain from having any business relations with your orator, or to patronize your orator by purchasing from your orator the said product and output of your orator's said plants, or from being customers of your orator, or from buying anything from your orator, or sustaining any business relations to

your orator, and to so induce, persuade, and coerce all persons to discontinue all dealings with your orator, if your orator shall refuse to comply with the said request and demand of the said defendants, and to exclude your orator from business relations with the public, and to practically break up, suspend, and ruin your orator's business, if your orator shall refuse to accede to the said demand of said conspirators; and the said defendants have so conspired as aforesaid, and to accomplish said conspiracy, by serving notice upon all persons engaged in any business, of a kind in which the product and output of your orator's plant are used, not to patronize your orator, upon pain of withdrawal of patronage from such persons of said conspirators, and of various members of their said organizations, and of all affiliated and sympathizing kindred organizations, and that said conspirators, and those associated with, related to, and subject to the control of, said conspirators consist of a vast body of people, the number of which is unknown to your orator, in all of the great commercial and trade centers of this and other countries, and possess great power, and are able to, and if unchecked will, do to your orator great damage and injury."

The ground upon which the jurisdiction in equity is rested is that the defendants are, in the language of the opinion of the court, "persons of small means." It will be observed that the bill alleges specifically how the "boycott" was to be conducted, and also how the "conspiracy" was to be accomplished, and that force, threats, or violence is not an element either of the boycott or the alleged conspiracy. Any contention that the defendants meditated violence is silenced by the statement in the brief of the plaintiff's attorney that "it is fair to presume, from the resolution and other testimony, that the defendants were determined to use all means, short of violence, to make the proscription effective." The material part of the answer of the Coopers' International Union appears in the affidavit of its president, and is as follows:

"That about a year and a half prior to the commencement of this action the complainant company commenced to operate certain hooping machines (i. e. machines for cutting hoop locks in, and putting wooply hoops upon, tierces, and barrels); that said machines were attended to, and operated by, child labor in said shop (in many instances by children under the age of fourteen years), and that in the operation of said machines the said children were constantly exposed to serious injury, by reason of tender years, inexperience, and the manner of the operation of said machines; that the tierces or barrels hooped by these machines were of an inferior quality, and the said lock, and the manner of locking the hoops thereon, being of such a construction that the said tierces and barrels were unable and unsuitable for the purpose of handling and holding for transportation the products of the packing houses and various other manufacturers,—a fact that was recognized and well known by many of the packing concerns in and about Wyandotte county, Kansas. Affiant further says that during the time of his employment by the complainant company there has been returned to said company, as defective and unfit for use, as high as forty-seven out of a shipment of fifty machine-made barrels, and that the percentage of machine-hooped barrels returned to the complainant company as defective was, of an average, ten times as many as returned from the hand-hooped shipments, even though the complainant company employed and retained a large number of unskillful and inefficient men, engaged in hooping barrels and tierces, which said men were not members of said Coopers' Union, and, by reason of their inefficiency, could not become members thereof; that, by reason of the unworkmanlike and defective barrels manufactured and turned out by the said machines, the wages and compensation of the aforesaid journeymen coopers employed in the cooperage establishments of Wyandotte county, Kansas, were threatened to be materially lowered and reduced, in this, to wit: that in the use of said machines, in connection with child labor the said complainant company were enabled to,

and did, discharge (throw out of employment) a large number of competent and efficient journeymen coopers, citizens of the state of Missouri, and citizens of the state of Kansas, and members of the said Coopers' Union, and that thereafter the said Coopers' Union was informed by some, if not all, of the various cooperage establishments in Wyandotte county, Kansas, that unless the complainant company ceased to operate said machines, and to flood the market with the cheap and inferior tierces and barrels, they would be obliged to reduce the wages and compensation paid by them to journeymen coopers employed in their various plants, and that one cooperage establishment did reduce the price and compensation of said journeymen coopers, and also threatened the said journeymen coopers belonging to said Coopers' Union with discharge unless the said output and competition of the cheap and inferior product be taken out of the market;  *  *  *  that at no time during the said controversy between said Coopers' Union and said Trades Assembly and the said complainant company has there been any violence threatened or contemplated, and that at no time during said period has there been any unlawful interference with the business of the said complainant company, or has any unlawful interference been threatened; that it is the intention of the said Coopers' Union and Trades Assembly, in case the said complainant company insists upon the use of said machines, and the consequent deprivation of the workingmen, members of said Coopers' Union, of their means of livelihood, that they will request (without in any manner threatening violence, or without making any demonstration of force, and without the use of violence, force, or any coercion of any kind) the co-operation of their fellow workingmen in refusing to purchase or use commodities packed in said defective tierces and barrels manufactured by machinery and child labor;  *  *  *  that the action of the said Coopers' Union and said Trades Assembly are simply acts of business competition, opposing the said complainant company, together with all other persons manufacturing wooden, machine-hooped tierces and barrels, and their attempt to use and foist upon the public, machine and child-labor manufactured barrels and tierces; and assisting the said workingmen in securing and protecting their wages and their source of livelihood."

These excerpts from the pleadings accurately present the issues between the parties. In the plaintiff's bill, and the court's opinion, the words, "conspiracy," "threats," and "coerce," are freely used. Indeed, the plaintiff's case is made to rest upon the use of these terms. It is important, therefore, at the threshold, to inquire what is meant by the use of these legal epithets in this case. Unexplained, they have an evil import. A conspiracy is defined to be:

"A combination of persons for an evil purpose; an agreement between two or more persons to do in concert something reprehensible, and injurious or illegal; particularly, a combination to commit treason or excite sedition or insurrection: a plot; concerted treason." Cent. Dict.

From the earliest times the word has been used to denote a highly criminal or evil purpose. Thus, in Acts xxiii. 12, 13, it is said:

"And, when it was day, certain of the Jews banded together, and bound themselves under a curse, saying that they would neither eat nor drink till they had killed Paul. And they were more than forty which had made this conspiracy."

Plainly, nothing the defendants did, or are charged with intending to do, comes within this definition of a conspiracy. So as to "threats." In the common acceptation, a threat means the declaration of a purpose to commit a crime or some wrongful act. Now, what the defendants did, and all they did, is explicitly testified to by Mr. Cable, the president of the Coopers' International Union. He says that the Coopers' Union gave complainant notice—

"That unless their use of said machines, and competition of the inferior tierces and barrels with the hand-hooped barrels of the journeymen coopers, members of said association, should cease on or before January 15, 1896, that a boycott would be declared by said Coopers' Union upon the contents of the tierces and barrels hooped by the hooping machines in Wyandotte county, Kansas; meaning thereby that the members of said Coopers' Union, and of its parent association, the Trades Assembly, would thereafter cease to purchase or use any commodities that were packed in machine-hooped tierces and barrels."

Many other witnesses testified to the same effect, and there is no testimony to the contrary. The "conspiracy" charged upon the defendants consisted, then, in the Coopers' Union and the Trades Assembly agreeing not "to purchase or use any commodities that were packed in machine-hooped tierces and barrels, which came in competition with the hand-hooped barrels," which were the product of their labor (and the bill charges no more); and the "threats" consisted in giving the complainant and certain packing houses formal notice of this purpose. The alleged "conspiracy," therefore, was the agreement stated, and the alleged "threats" were the notice given by that agreement, and the "coercion" was the effect that this agreement and notice had on the minds of those affected by them. It is not true that there is nothing in a name. When for "conspiracy" we substitute "agreement," and for "threats" a "notice," the whole fabric of the plaintiff's case falls to the ground. "There are," says Dr. Lieber (Civil Liberty and Government), "physchological processes which indicate suspicious intentions"; and among them is the use of high-sounding and portentous terms, from which much may be implied or imagined, instead of using plain and common words, which accurately describe the action, and leave nothing to implication or imagination. If an act done or threatened to be done is lawful, it cannot be made unlawful by giving it a name which imports an illegal act. Names are not things. It is the thing done or threatened to be done that determines the quality of the act, and this quality is not changed by applying to the act an opprobrious name or epithet. Unless the definition of a word fits the act, the definition is false, as applied to that act. "Conspiracy" sounds portentous, but in this instance its sound is more than its meaning. As here used, it describes a perfectly innocent act,—as much so as if the charge was that the defendants "conspired" to feed a starving comrade, or to bury a dead one. But if the bill charged, and the proof showed, that a breach of the peace was imminent, that fact would not confer jurisdiction on a court of chancery. Courts of equity have no jurisdiction to enforce the criminal laws. It is very certain that a federal court of chancery cannot exercise the police powers of the state of Kansas, and take upon itself either to enjoin or to punish the violation of the criminal laws of that state. It is said by those who defend the assumption of this jurisdiction by the federal courts that it is a swifter and speedier mode of dealing with those who violate or threaten to violate the laws than by the prescribed and customary method of proceeding in courts of law; that it is a "shortcut" to the accomplishment of the desired object; that it avoids the delay and uncertainty incident to a jury trial, occasions less expense, and insures a speedier punishment. All this may be conceded to be true. But

the logical difficulty with this reasoning is that it confers jurisdiction on the mob equally with the chancellor. Those who justify or excuse mob law do it upon the ground that the administration of criminal justice in the courts is slow and expensive, and the results sometimes unsatisfactory. It can make little difference to the victims of short-cut and unconstitutional methods, whether it is the mob or the chancellor that deprives them of their constitutional rights. It is vain to disguise the fact that this desire for a short cut originates in the feeling of hostility to trial by jury,—a mode of trial which has never been popular with the aristocracy of wealth, or the corporations and trusts. A distrust of the jury is a distrust of the people, and a distrust of the people means the overthrow of the government our fathers founded. Against the exercise of this jurisdiction the constitution of the United States interposes an insurmountable barrier. In that masterly statement of the grievances of our forefathers against the government of King George, and which they esteemed sufficient to justify armed revolution, are these: "He has combined with others to subject us to a jurisdiction foreign to our constitution and unacknowledged by our laws;" and "For depriving us in many cases of the benefit of trial by jury." Smarting under these grievances, the people of the United States, under the lead of Mr. Jefferson, were extremely careful to place it beyond the power of any department of the government to subject any citizen "to a jurisdiction foreign to our constitution and unacknowledged by our laws," or to deprive any citizen "of the benefit of trial by jury." This was accomplished by inserting in the constitution of the United States these plain and unambiguous provisions:

"The trial of all crimes, except in cases of impeachment, shall be by jury." Const. art. 3. "No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land and naval forces, or in the militia when in actual service in time of war or public danger." Const. Amend. art. 5. "In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury. * * *" Id. art. 6. "In suits at common law where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." Id. art. 7.

These mandatory provisions of the constitution are not obsolete, and are not to be nullified by mustering against them a little horde of equity maxims and obsolete precedents originating in a monarchical government having no written constitution. No reasoning and no precedents can avail to deprive the citizen accused of crime of his right to a jury trial, guarantied to him by the provisions of the constitution, "except in cases arising in the land and naval forces, or in the militia when in actual service in time of war or of public danger." These exceptions serve to emphasize the right, and to show that it is absolute and unqualified, both in criminal and civil suits, save in the excepted cases. These constitutional guaranties are not to be swept aside by an equitable invention which would turn crime into a contempt, and enable a judge to declare innocent acts crimes, and punish them at his discretion. But notwithstanding the constitution expressly enumerates the only exceptions to the right of trial by jury, and positively limits those exceptions to the

cases mentioned, those who favor government by injunction propose to ingraft upon that instrument numerous other exceptions which would deprive the great body of the citizens of the republic of their constitutional right of trial by jury. With the interpolations essential to support government by injunction, the constitution would contain the following further exceptions to the right of trial by jury:

"And except when many persons are associated together for a common purpose, and except in the case of members of trades unions, and other labor organizations, and except in cases of all persons 'of small means.'"

Undoubtedly, it is the right of the people to alter or abolish their existing government, "and," in the language of the Declaration of Independence, "to institute a new government, laying its foundations on such principles, and organizing its powers in such form as to them shall seem most likely to effect their safety and happiness." It is competent for the people of this country to abolish trial by jury, and confer the entire police powers of the state and nation on federal judges, to be administered through the agency of injunctions and punishment for contempts; but the power to do this resides with the whole people, and it is to be exercised in the mode provided by the constitution. It cannot be done by the insidious encroachments of any department of the government. Our ancestors, admonished by the lessons taught by English history, saw plainly that the right of trial by jury was absolutely essential to preserve the rights and liberties of the people, and it was the knowledge of this fact that caused them to insert in the constitution the peremptory and mandatory provisions on the subject which we have quoted. English history is replete with examples showing that the king and his dependent and servile judges would have subverted the rights and liberties of the English people, but for the good sense and patriotism of English juries. It is to the verdicts of the juries, and not to the opinions of the judges, that the English people are chiefly indebted for some of their most precious rights and liberties. A brief reference to one or two of the many cases will serve to illustrate this truth, and show why a trial by jury is the only sure and safe refuge the citizen has for his rights and liberties:

William Penn and William Mead were Quaker preachers. Their religious faith was offensive to the king, and to his judges and the governing class. The Quaker meeting house having been closed against them, the congregation assembled, in that quiet and orderly manner characteristic of Quakers, in an open place near their meeting house, where Penn was preaching to them, when they were set upon by the police and violently dispersed. For this Penn and Mead, and not the police who created the disturbance, were indicted. The indictment charged:

"That by agreement between him [Penn] and William Mead before made, and by abetment of the aforesaid William Mead, then and there, in the open street, did take upon himself to preach and speak, and then and there did preach and speak unto the aforesaid William Mead and other persons."

The indictment, like the complaint in this case, bristled with charges of conspiracy, unlawful assembly, etc. Penn, being denied counsel, was compelled to defend himself. When arraigned, he

pleaded "Not guilty," and the following, among other, proceedings took place in court during his trial:

"Penn: I affirm I have broken no law, nor am I guilty of the indictment that is laid to my charge; and to the end the bench, the jury, and myself, with these that hear us, may have a more direct understanding of this procedure, I desire you would let me know by what law it is you prosecute me, and upon what law you ground my indictment. Rec.: Upon the common law. Penn: Where is that common law? Rec.: You must not think that I am able to run up so many years, and over so many adjudged cases, which we call 'common law,' to answer your curiosity. Penn: This answer, I am sure, is very short of my question; for, if it be common, it should not be so hard to produce. * * *"

Despite much browbeating from the court, Penn continued to demand of the court to be shown the law that made it a crime for him to preach, and for his congregation to assemble to hear him. Finally the court ordered the bailiff to:

"Take him away. Take him away. Turn him into the bail dock."

Continuing his defense, Penn said:

"Must I therefore be taken away because I plead for the fundamental laws of England? However, this I leave upon your consciences, who are of the jury, and my sole judges,—that if these ancient fundamental laws, which relate to liberty and property, and are not limited to particular persuasions in matters of religion, must not be indispensably maintained and observed, who can say he hath right to the coat upon his back?"

Despite the peremptory charge of the court to find Penn guilty of the alleged "conspiracy" and "unlawful and tumultuous assembly," the jury returned a verdict of "guilty of preaching only." At this the court fell into a passion, browbeat the jury, particularly their foreman, Bushel, and sent them out to return a general verdict of guilty. This the jury refused to do, and, after being sent out three or four times, they returned a general verdict of not guilty, whereupon they were fined for contempt of court in rendering the verdict contrary to its instructions and to its interpretation of the facts. 6 How. State Tr. 951. But the jurors asserted their right to render a verdict in accordance with the dictates of their own consciences and judgments, and the court to which they appealed held that they had that right, and could not be punished for exercising it, and reversed the fine. The Penn Case, and the proceedings that grew out of it, constitute one of the foundation stones in the English bill of rights. With all their astuteness and eager desire to serve the crown, it never occurred to the judges in those days to enjoin the Quakers from meeting, and Penn from preaching to them. This "shortcut" would have gotten rid of the jury, and placed Penn and his followers completely in the power of the judges; and, instead of becoming the founder of a great city and commonwealth in a free republic, he would have languished in an English prison for contempt of court, incurred by preaching to his congregation, for he avowed in court "that all the powers upon earth" could not divert or restrain him from that duty.

A bookseller, whose publications contained criticisms on the administration of public affairs, was indicted for publishing a seditious libel. He was tried before the chief justice. "In vain," says an

authentic history, "did Lord Ellenborough, uniting the authority of the judge with the arts of the counsel, strive for a conviction. Addressing the jury, he said, 'Under the authority of the libel act, and still more in obedience to his conscience and his God, he pronounced this to be a most infamous and profane libel.' But the jury were proof against his authority and his persuasion." 2 May. Const. Hist. Eng. They returned a verdict of not guilty, thus vindicating the freedom of the press, and the right to criticise the administration of public affairs.

Seven bishops presented a respectful petition to the king, praying for the enforcement of the laws of the kingdom, and for a redress of grievances. For this they were indicted for libel. It is worth while to note the charge of the judges to the jury. The chief justice said: "And I must, in short, give you my opinion: I do take it to be a libel." And Justice Allibone said to the jury: "Then I lay this down for my next position: That no private man can take upon him to write concerning the government at all; for what has any private man to do with the government, if his interest be not stirred or shaken?" and much more to the same effect. After receiving this charge, the jury, says Lord Campbell, "were marched off in the custody of a bailiff, who was sworn not to let them have meat or drink, fire or candle, until they were agreed upon their verdict. All night were they shut up; Mr. Arnold, the king's brewer, standing out for a conviction, until six next morning, when, though dreadfully exhausted, he was thus addressed by a brother juryman: 'Look at me. I am the biggest and the strongest of the twelve; but, before I find such a petition as this a libel, why, I will stay until I am no bigger than a tobacco pipe.' The court sat again at ten the next morning, when the verdict of not guilty was pronounced, and a shout of joy was raised, which was soon reverberated from the remotest parts of the kingdom." 2 Camp. Ch. Jus. 111.

Cases similar to these might be multiplied indefinitely, but enough have been cited to show that it was through the good sense, courage, and love of liberty of the sturdy English juries who stood out against the judges that the right of the people to assemble for lawful purposes, and the right to address them when they were assembled, the right of free speech, and the freedom of the press, and the right of petition for the redress of grievances, were secured to the English people. It is profitable to recur occasionally to these historic cases. They shed light on the action of the framers of our constitution, and explain their resolute and determined purpose to secure to the people of this country the right of trial by jury, against encroachments or invasion from any quarter or upon any pretext, or by any device whatsoever. The framers of the constitution knew that it was not enough that "the rights of man be printed, and that every citizen have a copy." The rights and liberties guarantied to the people by the constitution would avail them nothing unless they were constantly and carefully guarded from invasion and encroachment from any quarter. They had formed a "government of the people, by the people, for the people," and they committed the protection and defense of the rights of the people under that government to the only

agency that could be trusted,—to a jury of the people. They put the rights and liberties of the people in the keeping of the people themselves. The king of England, when a petition was presented to him, reciting his encroachments on the rights and liberties of his subjects, and praying for a redress of grievances, returned for answer that "the king's prerogative is to defend the people's liberties." The assurance was not comforting, and brought no relief. Our fathers invested the prerogative of maintaining and defending the people's rights and liberties in the people themselves,—in a jury. English judges of great learning and ability had sided with the crown and the aristocratic classes in oppressing the people, and denying them those rights and liberties to which they had an undoubted right by natural law, as well as under their charters of liberty. This denial had been, in a large measure, rendered nugatory by the firm stand for liberty taken by English juries. "History repeats itself." This maxim was not lost on the framers of our constitution. They intended to, and did, interpose an insuperable barrier to the loss of, or the impingement upon, the rights and liberties of the people, by the same agencies that vexed our English ancestors. That insuperable barrier was trial by jury. In this country the right of wage earners and others to associate together and act collectively is not a boon granted by the government. It is not derived from the constitution, statutes, or judicial decisions. It antedates the constitution. It is a natural and inherent right. It is the natural weapon of weakness. Its only enemies are despots, and those who would oppress the weak in the absence of the protection afforded them by organization and combined action. This right of men to combine together for lawful purposes necessarily carries with it the right of combined action. Of what utility is organization without the right of collective action? Collective action is implied in the very term "organization." Organization has no other object. Man, by nature, is a social being. Association and collective action, by those having common interests, for their protection and material, moral, and mental improvement, is a natural instinct. The British parliament, whose power of legislation is unrestrained, and the English courts, in the beginning of the struggle between capital and labor, supposed that they could successfully and permanently suppress this instinct; but, happily for mankind, the natural rights of man and the laws of nature proved more powerful and enduring than the acts of parliament and the judgments of courts. The association of men for combined action was declared to be a conspiracy. The wages of laborers were fixed by acts of parliament, and it was made a crime for a laborer to refuse to work for the statutory wages, or to demand an increase of wages, or to quit the service of his employer. These acts were rigorously enforced by the courts, and their spirit found expression in the judgments of the courts long after their repeal. The courts did more, however, than simply enforce the acts of parliament. They supplemented them by laws decreed by themselves,—judge-made laws,—among which was the one relied on by the majority of the court to convict the defendants in this case of a conspiracy. This invention of the judges was the most effective rule ever devised by

the enemies of liberty to deprive men of the natural right of association and co-operation, and to place them completely at the mercy of despotic power, and those whose interest it was to oppress them. Referring to the case of Bohn Mfg. Co. v. Hollis (a case which fully supports the contention of the defendants), the majority of the court say:

"The decision to this effect was placed on the ground that members of the association might lawfully agree with each other to withdraw their patronage, collectively, for the reasons specified in the agreement, because the members, individually, had the right to determine from whom they would make purchases, and withdraw their patronage at any time, and for any reason which they deemed adequate. It is not always the case, however, that what one person may do, without rendering himself liable to an action, many persons may enter into a combination to do. There is a power in numbers, when acting in concert, to inflict injury, which does not reside in a single individual; and for that reason the law will sometimes take cognizance of acts done by a combination, when it will not do so when committed by a single individual."

The proposition here approved by the court, and relied on to weaken the authority of the Bohn Mfg. Co. Case, first emanated from an English court. Rex v. Journeymen Tailors, 8 Mod. 11. As laid down in that case, the formula reads:

"A conspiracy of any kind is illegal, although the matter about which they conspired might have been lawful for them, or any of them, to do, if they had not conspired to do it."

This proposition, that it is unlawful for men to do collectively what they may do, without wrong, individually, was enunciated more than a century and a half ago, when all manner of association and co-operation among men, offensive to the king, or not in the interest of despotic power or the ruling classes, or not approved by the judges, were declared by the courts to be criminal conspiracies. It was promulgated at a time "when," in the language of Mr. Justice Harlan in his opinion in Robertson v. Baldwin, 165 U. S. 288, 17 Sup. Ct. 333, "no account was taken of a man as man, when human life and human liberty were regarded as of little value, and when the powers of government were employed to gratify the ambition and pleasure of despotic rulers, rather than promote the welfare of the people," and when laborers had no rights their employers or the courts were bound to respect. The idea of the power of men in association has always been abhorrent to despots, and to those who wish to oppress their fellow men, because its free exercise is fatal to despotism and oppression. The strength it imparts carries its own protection. In all ages those who seek to deprive the people of their rights justify their action by ancient and obsolete precedents, and by coining definitions suited to their ends. In "that codeless myriad of precedent," running back to the Dark Ages called the "Common Law," it is not difficult to find a precedent for inflicting any injustice or oppression on the common people. But these precedents, so shocking to our sense of right, so inimical to our constitution and social and economic conditions, and so subversive of the liberty of men, should be permitted to sleep in profound oblivion. They neither justify nor palliate encroachments on the natural and constitutional rights of the citizens. Under this asserted rule, what a man, when acting

singly, may lawfully do, he may not do in concert with his neighbor. What all men may lawfully do, acting singly, it is unlawful for any two or more of them to do, acting in concert or by agreement. What each individual member of a labor organization may lawfully do, acting singly, becomes an unlawful conspiracy when done by them collectively. Singly, they may boycott; collectively, they cannot. The individual boycott is lawful, because it can accomplish little or nothing. The collective boycott is unlawful, because it might accomplish something. People can only free themselves from oppression by organized force. No people could gain or maintain their rights or liberties, acting singly, and any class of citizens in the state subject to unjust burdens or oppression can only gain relief by combined action. All great things are done, and all great improvement in social conditions achieved, by the organization and collective action of men. It was the recognition of these truths that prompted the promulgation of the proposition we are discussing. The doctrine compels every man to be a stranger in action to every other man. This is contrary to the constitution and genius of our government. It is a doctrine abhorrent to freemen. It is in hostility to a law of man's nature, which prompts him to associate with his fellows for his protection, defense, and improvement. Under its operation every religious, political, or social organization in the country may be enjoined from combined action, if their religious faith or political creed or practice is obnoxious to the judge. It was originally designed for this very purpose. In his opinion in the case of Vegelahn v. Guntner (Mass.) 44 N. E. 1081, Judge Holmes says:

"So far, I suppose, we are agreed. But there is a notion, which latterly has been insisted on a good deal, that a combination of persons to do what any one of them lawfully might do by himself will make the otherwise lawful conduct unlawful. It would be rash to say that some as yet unformulated truth may not be hidden under this proposition. But, in the general form in which it has been presented and accepted by many courts, I think it plainly untrue, both on authority and principle. Com. v. Hunt, 4 Metc. (Mass.) 111; Randall v. Hazelton, 12 Allen, 412, 414. There was a combination of the most flagrant and dominant kind in Bowen v. Matheson [14 Allen, 502], and in the Steamship Co. Case, and combination was essential to the success achieved. But it is not necessary to cite cases. It is plain, from the slightest consideration of practical affairs, or the most superficial reading of industrial history, that free competition means combination, and that the organization of the world, now going on so fast, means an ever-increasing might and scope of combination. It seems to me futile to set our faces against this tendency. Whether beneficial on the whole, as I think it, or detrimental, it is inevitable, unless the fundamental axioms of society, and even the fundamental conditions of life, are to be changed. One of the eternal conflicts out of which life is made up is that between the effort of every man to get the most he can for his services, and that of society, disguised under the name of 'capital,' to get his services for the least possible return. Combination on the one side is potent and powerful. Combination on the other is the necessary and desirable counterpart, if the battle is to be carried on in a fair and equal way. I am unable to reconcile Temperton v. Russell [1893] 1 Q. B. 715, and the cases which follow it, with the Steamship Co. Case. But Temperton v. Russell is not a binding authority here, and therefore I do not think it necessary to discuss it. If it be true that workingmen may combine with a view, among other things, to getting as much as they can for their labor, just as capital may combine with a view to getting the greatest possible return, it must be true that, when combined, they have the same liberty

that combined capital has, to support their interests by argument, persuasion, and the bestowal or refusal of those advantages which they otherwise lawfully. control."

The asserted rule has no boundaries or limitations other than the chancellor's discretion. Whatever combined action he wills to permit is lawful. Whatever combined action he wills to prevent is a conspiracy. In this country the right of associate and combined action hangs on no such slender thread. But it is said that chancellors should exercise great caution and circumspection in the application of this rule. But this still leaves the right of combined action dependent on the discretion of a chancellor. Thus far they have exercised great discretion, and applied it to combined action of labor organizations only. A careful student of social and economical questions of the day, and of the status of the labor movements in England, says:

"A growth in civil rights on the part of the mass of citizens has attended the labor movement in England from the beginning until now. Workmen are no longer compelled or expected to act without counsel and without concert. They hold a yearly congress, whose object it is to consult on current questions, to watch their legislation, and to urge the measures they desire. The statute book has thus been rewritten in England, with a wide and just regard for the interest of the workman. The fundamental principles of commercial law have taken on new renderings, and accepted new assertions of right. The action of trade unions in demanding better terms, or even a boycott to secure these terms, is no longer a conspiracy in restriction of trade. These methods have won civil acceptance, and gotten to themselves social and moral forces in each instance according to their merit. They seem to be great means of social renovation, which anticipate and prevent revolution. That marvelous political history by which England has won her liberty is repeating itself in her social institutions. Combination is freely accepted. The principle is recognized,—a principle fundamental in social renovation,—that men may do collectively, without wrong, what they may do without wrong individually." Bascom on Social Facts and Principles, 237.

While laborers, by the application to them of the doctrine we are considering, are reduced to individual action, it is not so with the forces arrayed against them. A corporation is an association of individuals for combined action; trusts are corporations combined together for the very purpose of collective action and boycotting; and capital, which is the product of labor, is in itself a powerful collective force. Indeed, according to this supposed rule, every corporation and trust in the country is an unlawful combination; for while its business may be of a kind that its individual members, each acting for himself, might lawfully conduct, the moment they enter into a combination to do that same thing by their combined effort the combination becomes an unlawful conspiracy. But the rule is never so applied. Corporations and trusts, and other combinations of individuals and aggregations of capital, extend themselves right and left through the entire community, boycotting and inflicting "irreparable damage" upon, and crushing out, all small dealers and producers, stifling competition, establishing monopolies, reducing the wages of the laborer, raising the price of the food on every man's table, and of the clothes on his back, and of the house that shelters him, and inflicting on the wage earners the pains and penalties of the lockout and the blacklist, and denying to them the right of associa-

tion and combined action, by refusing employment to those who are members of labor organizations; and all these things are justified as a legitimate result of the evolution of industries resulting from new social and economic conditions, and of the right of every man to carry on his business as he sees fit, and of lawful competition. On the other hand, when laborers combine to maintain or raise their wages, or otherwise to better their condition, or to protect themselves from oppression, or to attempt to overcome competition with their labor or the products of their labor, in order that they may continue to have employment and live, their action, however open, peaceful, and orderly, is branded as a "conspiracy." What is "competition" when done by capital is "conspiracy" when done by the laborers. No amount of verbal dexterity can conceal or justify this glaring discrimination. If the vast aggregation and collective action of capital is not accompanied by a corresponding organization and collective action of labor, capital will speedily become proprietor of the wage earners, as well as the recipient of the profits of their labor. This result can only be averted by some sort of organization that will secure the collective action of laborers. This is demanded, not in the interest of wage earners alone, but by the highest considerations of public policy. In the suggestions on the rights of organized labor submitted by Mr. Olney, attorney general of the United States, as amicus curiæ to the court, in the case of Platt v. Railroad Co. (November, 1894) 65 Fed. 660, he said:

"Whatever else may remain for future determination, it must now be regarded as substantially settled that the mass of wage earners can no longer be dealt with by capital as so many isolated units. The time is past when the individual workman is called upon to pit his single, feeble strength against the might of organized capital."

And, speaking of the restrictions imposed upon laborers by the courts, he said:

"They cannot help knowing that organized capital is not so restricted. And, when treatment so apparently unfair and discriminating is administered through the instrumentality of a court, the resulting discontent and resentment of employés are inevitably intensified, because the law itself seems to have got wrong, and in some unaccountable manner to have taken sides against them."

A conspiracy is defined to be "any combination between two or more persons to accomplish an unlawful purpose, or a lawful purpose by unlawful means." Let the defendants' action be tested by this rule. Their purpose was to drive the plaintiff's barrels out of the market, by giving preference to the barrels produced by their labor, and this purpose was to be accomplished by means of the coopers' and trades' unions everywhere refusing to buy the barrels manufactured by the plaintiff, or any of the commodities packed in them by any one. Devested of the legal epithets and verbiage, this is precisely what the defendants propose to do, and all they propose to do. And it is this the court has enjoined them from doing. They are enjoined from refusing to buy the barrels, and the commodities packed in the same. If the defendants are not allowed to determine for themselves what they will not buy, they ought not to be allowed to determine what they will buy; and the court's guardianship should

go a step further, and tell them what to buy. If the court can enjoin the defendants from withdrawing their patronage and support from the plaintiff, and persuading others to do the same, it is not perceived why it cannot, by a mandatory injunction, make it obligatory upon the defendants to purchase the plaintiff's barrels and their contents, and persuade others to do the same. The invasion of the natural rights and personal liberty of the defendants would be no greater in the one case than in the other. The plaintiff has an undoubted right to hoop its barrels in any mode it sees fit, and the defendants have an undoubted right to refuse to purchase them, or the commodities packed in them, no matter how they are hooped. These are the business rights of the parties, and the exercise of its business right by one party is not an interference with the business right of the other. The defendants' declared purpose not to purchase commodities packed in barrels made by the plaintiff is not an illegal interference with its business, because it is not a business right of the plaintiff to require the defendants to purchase such commodities or to refrain from proclaiming their resolution not to purchase them. In a word, it is none of the plaintiff's business out of whose make of barrels the defendants purchase their meats and other supplies. It is said in the opinion of the court that those persons who did not discontinue the use of the complainant's barrels and the commodities packed in them would "possibly run the risk of sustaining some personal injury." The suggestion is not warranted by any averment in the bill, nor is there a scintilla of evidence in the record to justify it. It does the defendants great injustice. No men could go about a business in a more peaceable, orderly, and law-abiding manner than did these defendants. A rigid purpose of order and keeping the peace presided over all their plans. Their sole purpose was a resolute business nonintercourse. It is, of course, possible for every man to inflict some personal injury on another. That can be predicated of all men, and, if this possibility is a ground for injunction, then every man, including the members of this court, should be enjoined from injuring every other man. If this is a sufficient ground for an injunction, a federal judge can, at his pleasure, slip an injunction noose over every neck in the republic. But an injunction is not granted "except with reference to what there is reason to expect in its absence." To enjoin law-abiding men from breaking the law, because it is in their power to break it, is to confound all distinction between the law-abiding man and the lawbreaker. The court say, "No decrease in the rate of wages had been threatened by the Oxley Stave Company." But such reduction of wages was threatened by all the other cooperage establishments. Mr. Cable testifies that the members of the Coopers' Union were notified by "the various cooperage establishments in Wyandotte county, Kansas, that unless the complainant company ceased to operate said machines, and to flood the market with the cheap and inferior tierces and barrels, they would be obliged to reduce the wages and compensation paid by them to journeymen coopers employed in their various plants, and that one cooperage establishment did reduce the price and compensation of said journeymen coopers, and also threatened the said journey-

men coopers belonging to said Coopers' Union with discharge unless the said output and competition of the cheap and inferior product be taken out of the market." Mr. Butler testifies "that the effect of the said action of the complainant company has already caused threats to be made of a large reduction of the wages of journeymen coopers employed in the cooperage plants in Wyandotte county, Kansas"; that other cooperage firms have notified their employés "that if the complainant company continued to operate said machines, and continued to place upon the market a cheap and inferior product in competition with the hand-made products of other plants, the said employés must expect a reduction in their wages, or a discharge from their employment." Moreover, independently of this direct testimony, it is obvious that, if the plaintiff's barrels drove out of the market the hand-hooped barrels, all coopers engaged in that branch of the work would lose their employment, and that the plaintiff would eagerly avail itself of any reduction in the wages of coopers by other cooperage establishments. The court further remarks, " *   *   *   With one exception, the members of the combination were not in the employ of the plaintiff company." The very object of labor organizations is to impart to every laborer the strength of all. A great nation will go to war to maintain the rights of its humblest citizen. A nation that would not do this would justly lose the respect of every other nation, and soon no respect would be paid to the rights of its citizens. The cause of one laborer is the cause of all laborers. Organized labor must give to each of its members its collective force and influence, else they will fall, one by one, a sacrifice to the greed of their employers. If labor organizations did not have the right to protect and defend the interests of their members, individually as well as collectively, they would be of no utility, and would soon come under abject submission to capital, which grants nothing of fundamental value to wage earners which it is not coerced to grant by the combined power of the labor organizations, or legislation brought about usually through their influence.

It will appear from a critical examination of the cases cited in support of the court's conclusion that the facts in each one of them entitled to respectful consideration as a precedent are widely different from the facts in this case. In every one of them having any close analogy to the case at bar, there was the element of violence, or threats of violence, or actual trespass upon the person or property, or the threat of it, or some display of physical force, or action which was held to constitute a trespass or implied threat. No one of these elements is found in this case. It is simply and purely a case where the labor organizations resolved that they would not purchase or use the barrels manufactured by the complainant, or any commodities packed therein. This they had an absolute right to do, without regard to the question how the complainant's barrels were manufactured, or whether they were inferior to, or better than, the hand-hooped barrels produced by the labor of the defendants. The grounds of the boycott are wholly immaterial, in determining the

right to boycott. Whether organized labor has just grounds to declare a strike or boycott, is not a judicial question. These are labor's only weapons, and they are lawful and legitimate weapons; and so long as in their use there is no force or threats of violence, or trespass upon person or property, their use cannot be restrained. Laborers are not wards of chancery. A court of chancery has no more authority to interfere with labor organizations, in the conduct of their business, than it has to interfere with the business of corporations and trusts, and other combinations of capital, in the conduct of their business; and in the case of a strike or boycott, as long as each side is orderly and peaceful, they must be permitted to terminate their struggle in their own way, without extending to one party the adventitious aid of an injunction.

Something is said about its being against public policy to boycott articles made by machinery. As before said, it is immaterial whether an article is produced by hand labor or machinery. Products produced by machinery are no more exempt from competition and a boycott than the products of hand labor. The products of machines stand on no higher plane, in law or equity, than the like products produced by the labor of man. They may be put in competition with each other, and that competition may be prosecuted precisely as was done in this case.

There are numerous authorities supporting the views of the minority,—many of them going far beyond the requirements of this case: Reynolds v. Everett, 144 N. Y. 189, 39 N. E. 72; Sinsheimer v. Garment Workers, 77 Hun, 215, 28 N. Y. Supp. 321; Com. v. Hunt, 4 Metc. (Mass.) 111; Randall v. Hazelton, 12 Allen, 412, 414; Publishing Co. v. Howell (Or.) 38 Pac. 547; Bowen v. Matheson, 14 Allen, 502; Continental Ins. Co. v. Board of Fire Underwriters of the Pacific, 67 Fed. 310; Mogul S. S. Co. v. McGregor, 21 Q. B. Div. 544; s. c. 23 Q. B. Div. 598; Bohn Mfg. Co. v. Hollis, 54 Minn. 223, 55 N. W. 1119; McHenry v. Jewett, 90 N. Y. 58; Gilbert v. Mickle, 4 Sandf. Ch. 357. The force of the Steamship Mogul Case, and others of the cases cited, is attempted to be broken by the statement that these were cases of "lawful competition in trade," and therefore not applicable to the defendants, who, it is impliedly said, are not entitled to enjoy the right of competition. This is a misconception of what it takes to constitute competition, and of the relation one must sustain to the business to be entitled to the rights of a competitor. The error probably springs from the erroneous assumption that a boycott cannot be used as a weapon of competition, or consist with it. Competition is defined to be an "endeavor to gain what another is endeavoring to gain at the same time." Cent. Dict. In such a struggle the boycott is perfectly legitimate. It is resorted to by great corporations and trusts,—the sugar trust, the meat trust, the oil trust, and scores of others. That one competing for the mastery in any line of business may rightfully resort to the boycott was decided in the Steamship Mogul Case. Mogul S. S. Co. v. McGregor, 15 Q. B. Div. 476. When that case was before Lord Chief Justice Coleridge, he said:

· "It was an application of the plaintiffs for an injunction to restrain the defendants from doing that which was called throughout the case - and which I really see no reason for hesitating to call, also --'boycotting the plaintiffs.'"

And he refused the injunction, and on appeal his judgment was affirmed.

It is the right of every man to compete with every other man in all lawful business pursuits. Every wage earner has this right. His own interests, no less than the interests of his employer, are at stake. If his employer cannot successfully compete with his rivals, he must either go out of business, or reduce the wages of his employés, as was threatened to be done in this case. The wage earner may therefore not only give preference to his employer's commodities, and to the product of his own labor, but he may carry competition to the bitter end, including the boycott, in order to gain the supremacy in the market for his employer's wares, upon whose successful sale his wages, and in some cases, probably, his existence, depend. Competition is not confined alone to cases where the competitors represent large moneyed capital, and are the exclusive owners of the commodity or business out of which the competition arises. It is a fundamental error to deny to labor the rights and privileges of competition, upon the ground that labor is not capital, and therefore not entitled to any of the rights of capital. It is capital of the very highest and most valuable type. It is the creator of all other capital. Cardinal Manning (a great authority upon any subject upon which he wrote, and who was a profound student of the social and economic problems of the time, with a view of adjusting the relations of the church to existing social conditions), speaking of the laborer and his rights, says:

"Among the English-speaking peoples of the world (that is, in the new world, which seems to be molding our future), a workingman is a free man, both in his person and in the labor of his hand. The mere muscular labor of his arm is his own, to sell as he wills, to whomsoever he wills, wherever and for whatsoever time he wills, and at whatsoever price he can. If his labor be skilled labor, or even half-skilled labor, it is all the more valuable, and absolutely his own possession. In truth, it is the most precious form of capital, which gold and silver may purchase, but on which gold and silver absolutely depend. Money is but dead capital, after all, but the live capital of human intelligence and the human hand is the primeval and vital capital of the world. Unless these rights of labor can be denied, liberty of organization to protect these rights and the freedom founded on them cannot be denied." Letter to Catholic Tablet, April 28, 1887.

In his first annual message to congress, Mr. Lincoln expresses the same idea in different language. He said:

"Labor is prior to, and independent of, capital. Capital is only the fruit of labor. Capital could never have existed if labor had not first existed. Labor is the superior of capital, and deserves much the more consideration."

That the struggle between the plaintiff and defendants is purely competitive is a fact proven in the case. Mr. Day, president and general manager of the Western Cooperage Company (an intelligent and disinterested witness), testifies that:

"The present controversy is simply a competition between the proprietors of wood-hooping machines and the journeymen coopers; the former endeavor-

ing to displace the latter by machine, unskilled labor, and the latter endeavoring to protect and maintain their wages and occupation."

It cannot be the law that the men and women who do the work of the world, and who produce its wealth, have no rights against the wealth they create, and no right to prefer and promote by lawful and peaceful means the sale of the products of their labor, to secure for themselves continued employment. The "irreparable damage" suffered in business by a vanquished competitor at the hands of his successful rival constitutes no cause of action, either at law or in equity. It is the result of the law of competition, to which all men are subject. They take their chances, and must abide the result, whether it bring fortune or failure. In the Steamship Mogul Case, Lord Chief Justice Coleridge said that it was the resolute purpose of the defendants—

"To exclude the plaintiffs, if they could, and to do so without any consideration of the results to the plaintiffs if they were successfully excluded. This, I think, is made out, and I think no more is made out than this. Is this enough? It must be remembered that all trade is, and must be, in a sense, selfish. Trade not being infinite,—nay, the trade of a particular place or district being, possibly, very limited,—what one man gains another loses. In the hand to hand war of commerce, as in the conflicts of public life, whether at the bar, in parliament, in medicine, in engineering (I give examples only), men fight on without much thought of others; except a desire to excel or defeat them."

And the learned judge held that the plaintiffs could have no redress for their losses; they were losses incident to competition in business, and, as we have seen, to a competition carried on by what the learned chief justice said was "boycotting the plaintiffs." If every one likely to be "irreparably damaged" by competition could enjoin his competitors from boycotting his wares (that is, refusing to buy or deal in them), there would soon be an end of all competition. Under the existing social and economic conditions, the natural person, it has been well said, is the merest rudiment of a man. He can only make his power felt, promote his interests, and defend his rights by association and combination with others. Business and commercial pursuits of any magnitude are not carried on by natural persons any more. All capital seeks to increase its power by combination, and to that end assumes the form of corporations and trusts. The plaintiff in this case is a corporation. It represents a number of persons associated together for the very purpose of combined and collective action. Many of these combinations are on a gigantic scale. Their power and influence are wellnigh irresistible. They are the employers of the great mass of the laborers. They are formed solely for pecuniary profit, and know no other law than that which promotes their pecuniary interests. They defy all social restraints that would have a tendency to lessen their dividends, What the stockholders want is more dividends, and the best manager is the man who will make them the largest. The struggle is constant between the laborers, whose labor produces the dividends, and those who enjoy them. The manager is tempted to reduce wages to increase dividends, and the laborers resist the reduction, and demand living wages. Sometimes the struggle reaches the point of open rupture. When it does,

HOPKINS V. OXLEY STAVE CO.

the only weapons of defense the laborers can appeal to is the strike or the boycott, or both. These weapons they have an undoubted right to use, so long as they use them in a peaceable and orderly manner. This is the only lawful limitation upon their use. That limitation is fundamental, and must be observed. It was observed in the case at bar to its fullest extent. If these weapons are withheld from them, then, indeed, are they left naked to their enemies. One class of men cannot rely for protection and the maintenance of their rights upon the justice and benevolence of another class, who would reap profit from their oppression. They must be in a position to compel respect, and make it to the interest of their adversary to grant their reasonable and just demands. Laborers can only do this by making common cause,—by organization and collective action. The right of organization itself may as well be denied to them, if the right of peaceful and orderly collective action is denied them. It is vital to the public interests, as well as to laborers, that this should not be done. A labor organization in itself teaches respect for law and order. The conscious obedience to the rules and regulations of the organization inculcates a spirit of obedience to all law. Orderly collective action can be attained through organization only. In its absence we have the ungoverned and ungovernable mob. A labor organization improves the mental, moral, material, and physical condition of its members. It teaches them how best to perform their duties, and to become expert in their several callings. The great improvement made in the last half century in the condition of the wage earners is due almost exclusively to the power of these organizations. Sir John Lubbock, whose learning and impartiality must be conceded, in a recent volume (Treasures of Life) ventures to predict that "the readers of the next generation will be not our lawyers, doctors, shopkeepers, and manufacturers, but the laborers and mechanics"; and, if this prediction is verified, it will be mainly due to the beneficent influence of these organizations. To strike them down at a time when their adversaries are more powerful than they ever were in the history of the world is to take a long step backward into the Dark Ages. It is, indeed, the revival of despotism for laborers, and means their practical enslavement to great aggregations of capital, whose greed takes no note of human destitution and suffering. Their adversaries combine to act collectively, and it is not a conspiracy. It is the business of the law to see that no man or class of men, under any pretext whatever, is granted rights or privileges denied to other men or classes of men. The public order must be secured, and private rights protected, under the constitution and laws, without denying to labor, or any other class of citizens, their natural and constitutional rights. Let the person and property of every citizen be securely protected by fixed laws, and speedy punishment follow the commission of crime. Let the constitutional mode of trial remain inviolate. The necessity for this is illustrated in this case. No American jury could be found who would say these defendants were guilty of a "conspiracy," or of making "threats" to injure any one. Like the jury in the Penn Case, they would say, "Guilty of refusing to purchase the plaintiff's

barrels and the commodities packed in them, only," and the common sense of all mankind would respond that that creates neither criminal nor civil liability on any one. The decree of the circuit court should be reversed, and the case remanded, with instructions to dismiss the bill.