## Diamond Block Coal Company v. United Mine Workers of America, et al.

### (Decided June 18, 1920.)

On Motion to Dissolve a Temporary Injunction Granted by Hon. John C. Eversole, Judge of the Perry Circuit Court.

1. Injunction—Right of Laborers to Organize.—The Perry circuit court granted the Diamond Block Coal Company, a Virginia corporation, doing business in Perry county, Kentucky, an injunction against the United Mine Workers of America and seventeen individuals, enjoining and restraining them and each of them from organizing locals or attempting to induce persons to join such locals as already exist: held that labor may lawfully organize unions so long as they do not trespass upon the rights of others, or are guilty of intimidation, duress, coercion or fraud.

2. Injunction—Injunctive Relief Against Individual Laborers—Equity.—The acts of individual members of a union, though contrary to law, and such as would subject them to criminal prosecution will not ordinarily justify a court of equity in granting injunctive relief against the organization itself, where the organization has been guilty of no wrong; but the individual members, if made defendants, may be enjoined.

3. Injunction—Right of Laborers to Organize.—An employer is not entitled to an injunction to prevent a union or its organizers from peaceably soliciting its employes to join the union, even though the employer refuses to work union labor and discharges such persons as join the union.

C. W. NAPIER and T. E. MOORE, JR., for appellant.

JESSE MORGAN, W. O. DAVIS and EDWARD C. O'REAR for appellees.

OPINION BY JUDGE SAMPSON—Dissolving injunction.

The Diamond Block Coal Company, a Virginia corporation doing a coal mining business in Perry county, Kentucky, filed its petition in the Perry circuit court on March 10, 1920, praying the clerk to grant it an immediate temporary restraining order and that the court make this perpetual, enjoining and restraining the defendants, United Mine Workers of America, and seventeen individuals named in the petition as defendants, and all persons working by, through or under them, or in their employment, from proceeding to erect, construct or build or attempting to erect, construct or build, near the coal plant of the plaintiff, shacks, houses or tents, or shelter of any kind, and from placing therein, or attempting to place therein any person or persons for the purpose of inducing or persuading any of its employes, laborer or laborers to break their contracts of employment with the plaintiff, and from doing divers other things set forth in the prayer of the petition; and as the petition was properly verified and bond given, the clerk of the court on that day granted a temporary restraining order in accordance with the prayer of the petition, and a copy of this order was served upon each of the eighteen defendants. At the time the judge of the Perry circuit court was absent from the county, and this was alleged in the petition. After alleging that the plaintiff is a corporation organized under the laws of Virginia for the purpose of mining and selling coal from its lease of 1,493½ acres of valuable coal land, located about three miles above the town of Hazard, in Perry county, upon which lease it has seventy-eight houses for its employes, and a tipple, railroad switch and other improvements necessary in mining and marketing coal, and that it has been running its mine regularly and finding a market for its product for about four years without

experiencing any labor troubles, and that its employes about seventy-five in number, were content and well satisfied with the labor conditions prevailing at the mines, it alleges that the defendants, naming them, "are each claiming to have some connection of some sort with their co-defendant, United Mine Workers of America, and as such, with the exception of the defendants, Jack Morris and Lee Marks, are and have been for some time holding meetings for the purpose, as the plaintiff is informed, of attempting to interfere in some way with what they term the miners employed and engaged in its mine, and all workers employed by it in and about its mine, but so far have failed to make any headway thereat, but the plaintiff now says that the defendants acting together and in concert with each other, and individually are now threatening to come near to and in to the plant of the plaintiff and erect nearby its plant, and within 200 yards thereof, houses, tents, shacks and buildings, barns and to drill wells and open up a regular camp for agitators for the purpose of intimidating, alarming and disturbing its employes, and its officers and managers in charge of its plant to such extent that they will abandon their contracts of employment with it either through fear of violence or through the unlawful persuasion used by the defendants in their efforts to break the contracts of labor between it and its employees, and induce them to quit its employment and come into the camp which they are erecting near by, and at which camp they propose to take any employee who is not engaged, and will not become engaged in the actual mining of coal, and keep him at their own expense, and house, clothe and feed him and his family provided he is not employed in the mining of coal, and will assist him in their unlawful way, and hinder it in the production of coal at its mines, and that the purpose and intention of the defendants and each of them in the location of the said camp and the construction of houses, shacks and the erection of tents thereon is to either by intimidation or by persuasion entice each and all of its employees at said mines to abandon their contracts of employment and labor with it, and thereby force it to close out its mines; and that each of the defendants are working together and in conjunction with each other under and by an agreement with each other for this purpose, and this purpose alone."

It is further alleged that the defendants are at-
tempting to establish a camp near the mines of the plain-
tiff company for the purpose of lodging therein agita-
tors to bring about unrest and dissension among its em-
ployes and thereby cause a strike and to prejudice the
minds of its employes against it. The petition also avers
that certain of the defendants are non-residents of the
state and are what are known as walking delegates or
international organizers, imported for the purpose of
fomenting unrest and disturbance in and about its camp,
and that all of these persons are acting together in an at-
tempt to do the plaintiff injury, and "are threatening
to come into its camp and among its men in crowds and
numbers and by demonstrations and by other acts and
demonstrations cause dissension and strife among its
employes to such an extent that it will bring about dis-
organization in its plant such as will prevent its op-
erating same; that the defendants are threatening to
build a number of shacks and to erect a number of tents
nearby plaintiff's mines for the purpose of housing men
in furtherance of the plan and scheme on the part of the
defendants to induce and persuade plaintiff's employes
to break their contracts with it and to become idle, and
thus bring about a complete shutdown of plaintiff's
mines.''

The answer traverses each of the material allega-
tions of the petition, and affirmatively pleads that the
United Mine Workers of America is a voluntary asso-
ciation with more than a half a million members scat-
tered over the United States; that there is no statutory
provision of law in this state authorizing an action
against voluntary association, and it pleads and relies
upon this fact as a complete bar and abatement to plain-
tiff's action; and further that the United Mine Workers
of America, a voluntary association of working people,
is authorized by an act of Congress dated June 20, 1886,
chapter 567, section 424, statutes 86, and is what is
known as a national trade union organized "for the pur-
pose of aiding its members to become more skillful and
efficient workers, the promotion of their general intelli-
gence, the elevation of their character, the regulation
of their wages and their hours and conditions of labor;
the protection of their individual rights in the prosecu-
tion of their trade or trades, the raising of funds for the
benefit of sick, disabled or unemployed members or the

families of deceased members, or for such other object or objects for which working people may lawfully combine, having in view their mutual protection or benefit.''

By reply the affirmative matter of the answer was traversed, and it was averred that if the defendants and each of them were not enjoined from doing the things complained of in the petition, the plaintiff would suffer great loss and damage. To this reply defendants filed a rejoinder, the affirmative allegations of which were by agreement controverted of record.

On March 23rd the defendants gave notice and entered a motion before Hon. John C. Eversole, judge of the Perry circuit court, ''to dissolve, cancel and set aside the restraining order'' granted by the clerk, and this motion was heard partly upon affidavits and partly on oral evidence which was taken down in shorthand and transcribed and made a part of the record now under consideration. Plaintiff, the Diamond Block Coal Company, filed and read ten affidavits, one of the affidavits containing the names of about fifty deponents, but only six of these affiants relate facts which are pertinent to the issue, the others stating only that they had been approached by persons representing themselves to be members of the organization known as United Mine Workers of America, and solicited to join the union and offered its benefits, and that they refused so to do because they were perfectly content with the conditions surrounding their employment with the plaintiff. Of the six who gave relative evidence, if the persons mentioned had been defendants, one of them, W. A. Shumate, named Lon Hamilton, McKinley Fowler and one Couch as threatening him if he did not join the union. Neither Hamilton, Fowler nor Couch are defendants and are not shown to be members of the United Mine Workers. The next affiant, Joe Cornett, stated that while in the employ of the plaintiff Lon Hamilton and Harrison McIntyre, representing themselves as members of the union, approached him and urged him to join the union and told him that he ''did not get any grub allowance as an employe of the Diamond Block Coal Company, but that if he would join their union they would see to it that he was given his grub and seventy-five cents a day; that the union was going to build houses in close proximity to the Diamond Block Coal Company and there take care of their men and keep them there and feed and house them and pay them money while

they were not working.'' At another time he stated that Clay Lawson and Fultz Newberry, also representing themselves as members of the union, told him that it was useless to guard the tipple, ''that the union men could blow it up if they wanted to and that the damn thing ought to be blown up anyway.'' And at another time Harrison McIntyre stated to affiant that he ''did not see any use in the company fighting the union that they would have to come to it.'' Neither of the persons named by affiant Joe Cornett are defendants, and except for the intimation in the affidavit that they are members of the union, no proof is adduced on that subject. The other affidavits are much the same as the ones referred to, but no person named in the affidavits as having threatened violence or attempted to intimidate or coerce an employe of the plaintiff is a defendant in the proceeding before us. No witness for the plaintiff relates any fact which proves, or in any measure tends to prove that the defendants, or either of them, have used unlawful means, or have threatened to use any unlawful means to promote the interest of the union, or to injure the plaintiff in its property or its property rights. No witness for plaintiff testifies to any act or threat of either of the defendants, except that the organization and some of the other defendants named have been endeavoring peaceably to organize and institute local unions of laboring people in the Hazard district and have solicited persons to become members of the organization, and have attempted to peaceably persuade working men of that district to join the union.

The plaintiff's general manager, R. F. Hoskins, was called as a witness and cross-examined by counsel for defendants. Among others things he was asked:

''Q. What position do you occupy with that company? A. I am the general manager. Q. Do you know where the W. O. Davis tract of land is with reference to your coal tipple? A. Yes. Q. How far is it? A. Well I have measured it; I would say it is about three or four hundred yards, air line, from our commissary and the houses on the north of the river, and about half a mile from our tipple and mine. . . . Q. How far are the houses (proposed to be built by defendants) away from your commissary and office? A. I said I would think about three or four hundred yards, . . . Q. Can you see the house from your office. A. No, sir. . . .

Q. Have you noticed anyone working or the Davis tract of land? A. I did not notice. I heard the carpenters working up there. Q. You just heard the sound of the hammering? A. I saw people working but it was a little too far to distinguish who they were. Q. While they were working up there they did not interfere with you in any way did they? A. No. Q. You was not disturbed by reason of the fact that they were up there working? A. No. Q. Did any of the men working up there on these houses attempt to do you any injury? A. Not as I know of myself. Q. Did they go upon your premises and interfere with you anyway? A. No. Q. Or with any of your employes? A. No. . . . Q. Do you know Wm. Larson (one of the defendants)? A. No, sir. Q. Has he trespassed upon your property to your knowledge? A. Not to my knowledge. Q. Do you know J. H. Brown (another defendant)? A. Yes, sir. Q. He has not trespassed on your property? A. Not to my knowledge. Q. Do you know Frank Hefferly (one of the defendants)? A. No. Q. He has not trespassed upon your property has he? A. Not to my knowledge."

The witness was then asked concerning each of the seventeen defendants named in the petition in like manner, and he answered he did not know of any trespass or wrong done by either of the defendants.

"Q. Tell the court whether or not the defendants have individually or collectively intimidated or coerced you, or any of your employes, or used any violence or force in any way to cause you to stop operating your mine or caused your employes to quit digging coal for you? A. Not as I know of. Q. Now you have never stopped the operation of your mine have you? A. No. . . . Q. Now, Mr. Hoskins, neither of the defendants have done any act that has caused you any damage have they? A. No. Q. Now, you charge that some of the defendants are threatening to go upon your property. Do you know of any defendant that has ever threatened to go upon your property? A. No. . . . Q. Have either of the defendants done any act or anything to your knowledge that would bring about any trouble in your camp? A. No. Q. Or any dissension or strife in your camp? A. No. . . . Q. Did they give you the name of any person who was threatening to do you any injury? A. They gave the name, I would have to get that from the affidavit. Here is one—Clay Lawson and Fultz Newberry. Q. Now then, Clay Lawson and Fultz New-

berry are not defendants here are they? A. No more than I am led to believe that they belong to the United Mine Workers. Q. You do not know that they belong do you? A. No. Q. Are they the only two men that you have ever received information that they was to do you injury? A. They are the only two I can recall. . . . Q. I notice you charge in your petition that the defendants are inducing and persuading your employes to break their contracts with you. None of the defendants have done that, have they? A. No, none of them mentioned in there. Q. What kind of contract have you with your employes? A. The contract whereby you can discharge them at your will and they quit at their will. I have no signed contract of course, but it is understood it has always been our policy that they have a right to move away at a minute's notice and we have that same privilege to discharge them for any cause. That has been our policy since the day we started. Q. Then it is your policy, a policy of your company to discharge men at your will and it is the corresponding right of them to quit when they desire at their will, either individually or collectively, just as they please? A. Certainly. Q. You claim the right to discharge all the employes you have got at any time? A. Yes. Q. You also grant them the right to quit collectively at any time? A. Yes. Q. Have any of your employes quit working for you at any time recently, quit of their own accord? A. Yes, sir. Q. Any of them been discharged by you recently? A. I think so, I cannot recall their names though. I know some have left and some have come and we have discharged some. Q. No act on the part of the defendants so far as you know has caused anyone to quit you, has it? A. Well, the general impression— Q. Your knowledge, what do you know? A. No, personally I have not heard the conversation. Q. Has the defendant, United Mine Workers of America, ever injured you in anyway to your knowledge? A. No more than having to discharge people for joining when it is our policy that we will not have union people, and cutting our production down. Q. Then do you tell the court that if miners who work for you join the United Mine Workers of America, it is your policy to discharge that miner? A. Yes. Q. For that reason and that alone? A. Yes. . . . Q. Do you refuse to employ miners who have joined the union if you know of that fact. A. Yes. Q. Do you know anything about the association known as the Hazard

Coal Operators' Association? A. Yes. . . . Q. Is
your company a member of that association? A. Yes.
. . . Q. Ever had any agreement as to how you would
treat the men who joined the union? A No, sir; it has
been our policy that we are not going to work union
labor. Q. Then there is an understanding and agreement
that your company and also that your neighboring com-
panies are not to work union labor? A. It is no agree-
ment. Q. It is a general understanding? A. I do not
know as you would call it an understanding. We are not
working them. . . . Q. Have you given any other
names of those who have joined the union? A. I have
given some names of men who have joined the union.
. . . Q. You also recognize the fact that they as a
body of laboring men have the right to protect their in-
terest in preparing shelter and places for those who are
evicted by the coal company? A. Everybody has the
right to try to protect themselves. Q. Then you tell the
court that you have no objection for these men as far as
you are concerned, in a legitimate way and in a legal
way, of building camp houses? A. I have an objection
or I would not be at this thing today. Q. I mean in a
legal way, as far as they have a right under the law? A.
Of course I object. I mean by that I don't want to see
anybody in the rain."

In regard to the union, the witness was asked:

"Some of your men did join? A. Yes. Q. And they
were discharged by you? A. Yes. Q. You had some liti-
gation in court about the houses in which they lived?
A. Yes. . . . Q. And you stated that your only rea-
son for discharging them was that they had joined this
union? A. Yes. . . . Q. Now, Mr. Hoskins, the men
you discharged never gave you any trouble, did they?
You just found out they had joined the union and you
discharged them and they went away? A. I don't know
as they gave us any trouble at the time we discharged
them. But it is our rule we will not work union labor.
. . . Q. Everything has gone on quietly and peace-
ably? A. Yes. Q. Those who joined the union, do you
know where they joined it, whether on your premises
or somewhere else? A. I do not think they have joined
on our premises."

From all the evidence, of which there is a great
quantity, the following facts may be adduced:

Some months before this litigation started, three or
four local unions among mine workers were organized

in the Hazard field, but neither one was located at Dia-
block; however a few of the men employed at plaintiff's
mines became members of one of these locals and were
discharged by the company for no other cause than that
they had become members of the union. The union was
trying to increase its membership and to organize other
locals, while the operators and the different members
of their association were attempting to suppress union
labor and to expel it from that coal field. While this
struggle was going on the men who were discharged for
joining the union were evicted by the companies from
their houses and as they could not obtain employment at
other camps in that vicinity, were often unable to find
shelter, and to overcome this obstacle the mine workers
leased three or four small pieces of ground at different
places in the Hazard field, one of the tracts being the
W. O. Davis tract mentioned in the evidence. It contains
about five acres, lies upon a hillside near the Kentucky
river and about one-half to three-fourths of a mile from
the place of business of the plaintiff, Diamond Block
Coal Company. It was the intention of the mine work-
ers to use these scraps of ground as building sites for
shanties or cheap dwelling houses and tents to be oc-
cupied by such of their membership as were evicted by
the companies from their tenant houses. A few days
before this litigation started, the United Mine Workers
entered into a written contract with defendants, Marks
and Morris, carpenters and builders of Hazard, to erect
ten shanties of given dimensions, upon the W. O. Davis
tract, and these workmen in pursuance to their contract
began the erection and had completed three of the houses
at the time the injunction was sued out and served on
them. The uncontradicted evidence shows that the mine
workers had great difficulty in finding and locating land
that they could lease for the purpose of erecting abid-
ing places for their men, and that the Davis tract was
not selected because it was near the Diamond Block Coal
Company, nor because it was especially desirable, but
rather because it was the only tract obtainable in that
vicinity. It further appears that while defendants were
anxious to organize the men working about the mines
throughout the Hazard field, they were not especially
interested in the organization of the men at plaintiff's
place.

On this hearing the circuit judge sitting as a chan-
cellor, overruled the motion of defendants to dissolve the

temporary restraining order and entered an order continuing the injunction in force until the case was prepared upon its merits, or until defendants could apply to a judge of this court for a dissolution.

As there is no evidence to support the allegations of the petition, that defendants have used threats, intimidation, coercion and fraud to accomplish their purposes, and as these allegations are specifically denied by defendants, thus putting the burden of proof upon the plaintiff, and as it is admitted by plaintiff and its officers that its mines continue uninterruptedly to run, and no employe has been induced by defendants, or either of them, to leave its employment, and that its employes have the right to quit its employment at any time, it follows that the plaintiff has wholly failed to make out its case unless it be that the peaceable solicitation of miners to become members of the organization in that district was a violation of the rights of the plaintiff, or that the leasing of the ground by defendants from Davis and others and the erection, or attempted erection of the shacks or tenant houses was an invasion of the rights of plaintiff. In its last analysis, plaintiff's only complaint supported by evidence is that defendants have leased the ground and are proposing to erect shacks thereon, and are soliciting other employes to become members of the union.

While the United Mine Workers of America is a voluntary association and not a corporation, it is recognized both by federal statutes and the statutes of Kentucky. The association, through its officers, had a right to enter into a lease contract with Davis and to erect the houses for the shelter of its membership. Of this there can be no doubt. That it was going to house and care for laboring men who had been discharged and evicted by employers in that vicinity because the men joined the unions, does not militate against the manifest right of the association to otherwise make a lease and erect houses. So long as the union keeps within its legal rights it may lease as much ground and erect as many houses as may satisfy its purpose, and it violates no right of the plaintiff because the rights of two persons never conflict.

Labor organizations have a status in this country the same as other associations. Courts without exception have recognized the right of laboring men to associate themselves together to better their conditions and to

increase their wages by lawful means. They may organize new lodges and solicit membership at any time or place so long as they do not trespass upon the rights of another. In the case of Saulsberry v. Coopers International Union, 147 Ky. 170, we said: "A man's labor is his own. He has the right to dispose of it upon the best terms he can secure; if one to whom it is offered or by whom it is desired is unable or unwilling to pay the price demanded for it, we have presented simply a case where the parties to a proposed contract can not agree as to terms, . . . The influences which actuate the employer in discharging the servant, or the servant in quitting the employ of the master, are not proper subjects of inquiry. If they possess the right to terminate the employment, they may exercise it although the one so doing may know it works inconvenience, if not a positive injury, to the other. The exercise of a legal right by one in a proper manner will not be denied although damage or loss may result to another as a necessary consequence thereof. . . . If the same principle applies to a union, which is but an organization of men for mutual benefit and protection, the plaintiff is remediless, even though his business is ruined. The right of laborers to organize for protection, in the way of securing better wages, shorter hours and improved facilities whereby their condition is bettered, has been many times before the courts of this country, and such right has been uniformily upheld."

In the case of Hopkins v. Osley Stave Co., 83 Fed. 912, it was said: "The courts have invariably upheld the right of individuals to form labor organizations for the protection of the interest of the laboring class, and have denied the power to enjoin the members of such associations from withdrawing peaceably from any service, either singly or in a body, even where such withdrawal involves a breach of contract."

The general rule seems to be that organizers of labor unions may use any peaceable means, not partaking of fraud, to induce persons to become members, and equity will not enjoin such organizers, or their associates, from attempting by proper argument to persuade others to join the union so long as they do not resort to force or intimidation. If the union should induce employes of the plaintiff to become members of its organization, and the plaintiff, as it has done in the past, should discharge such employes because of their membership in the union,

and the plaintiff should thereby lose the service of the employe, the proximate cause would not be the joining of the union by the employe but the discharge of the employe by the plaintiff, and the plaintiff could have no legal redress of the defendant, even though all its employes should so join the union and should in consequence suffer discharge by the plaintiff and its business should be closed. Neither will an injunction issue in a case of this character where there is no proof of irreparable injury or the evidence fails to show that the acts complained of are likely to be continued, nor will an injunction lie because of a single act of trespass in entering upon the premises of the complainant where there is no threatened repetition of the act.

It may be urged that there is evidence in this record sufficient to warrant the conclusion that certain of the persons named in the affidavits as making threats, or proposing injury to the plaintiff's employes or plant, were at the time members of the United Mine Workers of America, and therefore acting for and on behalf of the union. Even if it be granted that these men or any one or more of them were members of the union, and that they made the statements with which they are charged, no injunction would lie against the organization on account of such threats. The only way to reach such persons, under the facts of this case, is to make them defendants and if it had been shown that either of the defendants named had threatened to and was about to invade the premises of the plaintiff, intimidate, coerce or alarm its employes, injure its property or property rights, or otherwise infringe upon its lawful rights the injunction would not be dissolved as to such person, if it were made to appear that the plaintiff would suffer irreparable injury and that it had no adequate remedy at law. But that is not the case we have here.

In this jurisdiction the rule is thoroughly established that a labor organization, through its officers and agents, may organize new branches and solicit membership among employes of concerns that are opposed to union labor so long as they use only peaceable means, such as persuasion and argument, and are not guilty of threats against the person or property, intimidation, coercion or fraud. No sufficient facts were shown on which the extraordinary remedy of injunction should have been granted to complainant in this case, as in-

junctive relief can be had in no case except where it is made to appear that complainant has no adequate remedy at law and that great and irreparable injury will result.

Capital may lawfully organize for its advancement and protection. It does so every day. Labor may rightfully do the same thing. This is the American way—the best known way. A business man decides he would like to go into the coal mining business; he knows if he does he will, to some extent, reduce the business chances and profits of those concerns already in the business of producing coal, but he has the right, if he can, to engage in the business and to peaceably organize capital to aid him in carrying out his plans, and in doing this he may approach other business men and persuade or induce them or any number to join him in his new enterprise. Such men join their fortunes to make themselves more powerful, their business chances greater and their profits larger. For the same reason working men get together and organize. They want to increase their efficiency, power, influence and business chances. We are born equal in civil rights and so remain although our avocations and fortunes are widely different. What capital may lawfully do, labor may do with equal right. Neither has the lawful power to invade the rights of the other, nor would it be to the advantage of either. The two are inseparable companions. One can not exist without the other.

Some common basis can and must be found on which to work out the difficulties which confound industrials today without stiffling initiative, hope and ambition—the spirit of our institutions. An hour's labor in a given community at a given calling should bring the toiler a given sum, with purchasing power, measured in the common necessities of life, sufficient to carry him, if judiciously employed, for a given time. This basis must bear a fixed relation to the cost of production of such articles as wheat, corn, meat, cotton, wool and hides, as well as the value of the finished product of the hour's labor. When this plan is worked out and property administered, both labor and capital will be benefited and there will cease to be strikes and other manifestations of industrial unrest.

It is a general rule that voluntary associations, such as the United Mine Workers of America, have neither power to sue nor to be sued in the association's name, ex-

cept in special cases. 16 R. C. L., p. 465; 25 R. C. L., p. 72; Labatt's Mater & Servant, vol. 7, p. 8491 (note) Curd, &c. v. Wallace, &c., 7th Dana 192; Nichols v. Bardwell Lodge No. 179, I. O. O. F., 105 Ky. 172.

But as the injunction in this case must be and is dissolved on other grounds, it is not necessary here to further consider the question.

An order has been entered dissolving and setting aside the temporary injunction granted by the judge of the circuit court.

Whole court sitting.